

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-24-2006

# USA v. Yusuf

Precedential or Non-Precedential: Precedential

Docket No. 05-3484

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Yusuf" (2006). *2006 Decisions*. Paper 498.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/498

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3484

———

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS,

Appellants

v.

FATHI YUSUF MOHAMMED YUSUF a/k/a
FATHI YUSUF;
WALEED MOHAMMED HAMED a/k/a WALLY HAMED;
WAHEED MOHAMMED HAMED a/k/a WILLIE YUSUF;
MAHER FATHI YUSUF a/k/a MIKE YUSUF;
ISAM MOHAMAD YOUSUF a/k/a SAM YOUSEF;
UNITED CORPORATION d/b/a PLAZA EXTRA;
NEJEH FATHI YUSUF

———

On Appeal from the District Court for the Virgin Islands
Division of St. Croix
(D.C. No. 05-cr-00015)
District Judge:  Honorable Raymond L. Finch

———

Argued May 11, 2006
Before:  FISHER, COWEN and ROTH,[*] *Circuit Judges*.

(Filed August 24, 2006)

Alan Hechtkopf
S. Robert Lyons (Argued)
United States Department of Justice
Tax Division
P.O. Box 502
Wahington, DC  20044
        *Attorneys for Appellants*

Leon Friedman (Argued)
148 East 78th Street
New York, NY  10021
        *Attorney for Appellees*

Henry C. Smock
Smock Law Offices
Palm Passage, Suite B18-23
P.O. Box 1498
Charlotte Amalie, St. Thomas
USVI  00804
        *Attorney for Appellee*
        *Fathi Yusuf Mohammed Yusuf*

---

[*]The Honorable Jane R. Roth assumed senior status on May 31, 2006.

Gordon C. Rhea
Richardson, Patrick, Westbrook
 & Brickman
1037 Chuck Dawley Boulevard
Building A
Mount Pleasant, SC  29464

Randall P. Andreozzi
Marcus, Andreozzi & Fickess
6255 Sheridan Way, Suite 302
Williamsville, NY  14221
*Attorneys for Appellee*
*Waleed Mohammed Hamed*

Pamela L. Colon
27 & 28 King Cross Street
Christiansted, St. Croix
USVI  00820
*Attorney for Appellee*
*Waheed Mohammed Hamed*

John K. Dema
Law Offices of John K. Dema
1236 Strand Street, Suite 103
Christiansted, St. Croix
USVI  00820-5008
*Attorney for Appellee*
*Maher Fathi Yusuf*

Thomas Alkon
Alkon & Meaney
2115 Queen Street, Suite 101
Christiansted, St. Croix
USVI  00820
        *Attorney for Appellee*
        *United Corporation*

Derek M. Hodge
Mackay & Hodge
P.O. Box 303678
Charlotte Amalie, St. Thomas
USVI  00803
        *Attorney for Appellee*
        *Nejeh Fathi Yusuf*

———

## OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Defendants, a Virgin Islands corporation and several of its owners and operators, were charged in a seventy-eight count indictment with various criminal offenses, including money laundering, currency structuring, tax violations, mail fraud, obstruction of justice, and conspiracy.[1]  In connection with

---

[1]There are seven defendants in this case:  (1) United Corporation ("United"), a family-owned business located in the

4

securing various search warrants, an FBI special agent submitted an affidavit that contained admittedly inaccurate information, which had been supplied by the Virgin Islands Bureau of Internal Revenue ("VIBIR") pursuant to a court order. The District Court held a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and determined that certain statements in the affidavit were made with reckless disregard for the truth. The District Court then excised those statements from the affidavit and found that the reconstituted affidavit would have lacked probable cause. As a result, the District Court suppressed all of the evidence seized during the execution of the search warrants, effectively dismissing the Government's case.

We find that the disputed representations in the affidavit were not made with reckless disregard for the truth because the FBI agent did not have an "obvious reason to doubt the truth" of the information supplied by VIBIR. The District Court erred by

---

Virgin Islands that operates a chain of three Plaza Extra Supermarket stores in St. Thomas and St. Croix; (2) Fathi Yusuf, the primary shareholder of United; (3) Maher "Mike" Yusuf, Fathi's son, who is a part-owner of United and manager of one of the Plaza Extra stores; (4) Waheed "Willie" Hamed, Fathi's nephew, who manages the second Plaza Extra store; (5) Waleed "Wally" Hamed, Fathi's nephew and Waheed's brother, who manages the third Plaza Extra store; (6) Isam "Sam" Yousef, Fathi's nephew, who is a resident of St. Maarten, Netherlands Antilles, and owns and operates a retail furniture and appliances store; and (7) Nejeh Fathi Yusuf, Fathi's son, who is an owner and employee of United and who participated in the operation of the Plaza Extra stores.

5

failing to recognize that government agents should generally be able to presume that information received from a sister governmental agency is accurate.  To demonstrate that a government official acted recklessly in relying upon such information, a defendant must first show that the information would have put a reasonable official on notice that further investigation was required.  If so, a defendant may establish that the officer acted recklessly by submitting evidence:  (1) of a systemic failure on the agency's part to produce accurate information upon request; or (2) that the officer's particular investigation into possibly inaccurate information should have given the officer an obvious reason to doubt the accuracy of the information.  As we will explain herein, defendants in this case have failed to make this requisite showing, and, as a result, we find that the District Court erred in excising the disputed representations from the affidavit.

In addition, even assuming that portions of the affidavit should be excised, we conclude that the District Court clearly erred in concluding that the reformulated affidavit lacked probable cause.  The reformulated affidavit contained sufficient allegations of money laundering to provide probable cause to search the three grocery stores for specific types of corporate business records alleged to have been involved in the money laundering enterprise.   It is clear that the District Court's analysis on this point cannot be supported by the record.  Furthermore, the warrant does not fail as an unconstitutional general warrant.   The listing of the corporate items to be searched in the warrant application was not unconstitutionally overbroad, particularly considering this Court's repeated pronouncements to give greater flexibility in making the

6

probable cause determination in the context of large-scale, document-intensive corporate offenses.

For these reasons, we will reverse the decision of the District Court and remand the case for further proceedings consistent with this opinion.

I.

In seven deposits made between April 16-19, 2001, United placed $1,940,000 in currency in $50 and $100 denominations into its account with the Bank of Nova Scotia (the "Bank"). (App. 408). Because this activity was inconsistent with United's normal business banking activity, the Bank generated a Suspicious Activity Report on May 17, 2001, which was forwarded to the FBI's St. Thomas office on July 20, 2001. Based on that information, the FBI immediately opened a criminal investigation to investigate, *inter alia*, possible money laundering violations. (*Id.*) Federal grand jury subpoenas were issued to the Bank in mid-August 2001, and the Bank began producing documents relating to United's operating account on August 31, 2001. (*Id.*)

The FBI's investigation culminated several weeks later in an application for search warrants submitted to a magistrate judge.[2] That application contained a sworn affidavit that

---

[2] The application, filed October 19, 2001, sought warrants for the following locations and persons: (1) the Plaza Extra Supermarket in St. Thomas; (2) the Plaza Extra Supermarket in Frederiksted, St. Croix; (3) the Plaza Extra Supermarket in

7

detailed, in thirty-six numbered paragraphs and two exhibits, the Government's investigation to that point. The affidavit contained some background information regarding past immigration violations at the Plaza Extra stores. In 1999, United paid a $20,000 fine to settle an administrative proceeding brought by the Immigration and Naturalization Service (INS)[3] regarding its failure to fill out employee I-9 forms. Also in 1999, Fathi Yusuf pled guilty to three counts of unlawful employment of unauthorized aliens; he was subsequently sentenced in September 2001 to six months of house confinement. During that investigation, INS agents who searched the supermarkets found large amounts of U.S. currency inside the safe of one of the stores. A manager of the store who opened the safe told the agents that the money, which was in denominations of $50 and $100, totaled between $3 million and $7 million. Bank records obtained in the investigation revealed

Christiansted, St. Croix; (4) Fathi Yusuf's residence in St. Croix; (5) Waleed Yusuf's residence in St. Croix; (6) Waheed Yusuf's residence in St. Thomas; (7) the persons of Fathi Yusuf, Waleed Hamed, and Waheed Hamed; and (8) two safe deposit boxes in Maher Yusuf's name at the Bank of Nova Scotia in St. Croix. (App. 379.)

[3]On March 1, 2003, the INS ceased to exist as an agency of the Department of Justice. Pursuant to the Homeland Security Act of 2002, the enforcement functions of the INS were transferred to the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("BICE"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192.

8

that United never made any large-scale currency deposits of that magnitude in 1999.  (App. 395.)

The affidavit also utilized the financial records provided by the Bank to profile United's average currency deposits over an eighty-seven week period between January 2000 and August 2001, which reflected a pattern of currency deposits of $300,000 to $500,000 per week.  During that time span, currency deposits dipped below $300,000 on five occasions, the lowest total cash deposit being $140,000.  (App. 396.)  In contrast, nineteen weekly deposits exceeded $614,000, and seven of those deposits exceeded $920,000, which FBI Special Agent Thomas Petri, the FBI agent in charge of the investigation, characterized as "excessive when compared to the normal currency deposit pattern of United Corp."  (*Id.*)[4]

The affidavit focused in detail on the deposits made during the week ending April 21, 2001.  According to the affidavit, the seven cash deposits made between April 16 and 19 were inconsistent with the normal pattern of deposits made by United in three respects:  (1) the large total amount of $1.94 million deposited over a four-day period; (2) the fact that the deposits consisted solely of $50 and $100 bills; and (3) the

---

[4]According to the affidavit, criminals with large amounts of cash often seek out money launderers to conceal the source of funds realized through criminal activity.  The affidavit states that money launderers are typically individuals who are in a position to deposit large amounts of cash into banks without suspicion – such as bars, restaurants, liquor stores, and supermarkets.  (App. 392.)

fact that each deposit slip was marked "Cash (Stockholder's Investment)." (App. 396.) Moreover, the deposits themselves contained certain similarities. Each deposit was made in rounded amounts: $225,000, $250,000 (2 deposits), $300,000 (3 deposits), and $315,000. Although each of the deposits was made between April 16 and 19, the deposit slips were filled out in advance, dated April 12 through 19. According to the affidavit, all of this information "strongly implie[d] that the $1,940,000 cash was originally structured into smaller deposit amounts in order to create an appearance of deposits more consistent with the normal business activity, as opposed to a one-time cash deposit." (App. 397.)

The affidavit further noted that United issued two checks totaling $1.9 million to "Hamdan Diamond Corp." on August 17 and 19, 2001. The checks were signed by Waleed Hamed and marked "loan payment" and "partial payment" respectively. Hamdan is a retail business located in St. Maarten, Northern Antilles, owned in part by Fathi Yusuf. The affidavit noted that Fathi Yusuf is the sole signatory of Hamdan's Virgin Islands account, and that Hamdan shares the same Virgin Islands post office box as United. Moreover, the affidavit recounts information from a purportedly reliable foreign services agency which stated that Fathi Yusuf was a member of a network of Middle Eastern merchants who had made cash deposits in St. Maartens in 2000 in excess of $2.2 million. The agency told the FBI that these cash deposits were consistent with money laundering because "the amount of cash deposited appeared to far exceed the legitimate cash proceeds of their retail sales in St. Maartens." (App. 398.)

10

In addition, the affidavit contained information purportedly from three reliable confidential informants and one anonymous source. The first confidential source ("CS #1"), who had purportedly provided the Government with reliable information in the past, told the FBI that a known drug trafficker was in direct contact with the management of Plaza Extra in order to launder drug proceeds through the supermarket. A second confidential informant ("CS #2") informed the FBI that Waheed Hamed illegally purchased food stamps from stores owned by persons of Middle Eastern descent who were not authorized to collect reimbursements, in violation of federal law. In addition, a third confidential source ("CS #3"), who the affidavit stated was willing to testify, told the FBI that Waleed Hamed had arranged to smuggle more than $2 million in U.S. currency in Muslim robes to Sadaam Hussein during the first Persian Gulf War. CS #3 also described a conversation with Fathi Yusuf in which he said that "[a]ny man who can't take out $1 million a year in cash from a business like this is a fool." (App. 399.) Finally, the affidavit stated that the FBI received an anonymous phone call on October 12, 2001, in which the caller stated that the Yusuf had contacted a pilot, who had been previously convicted of alien smuggling, to transport two separate shipments of U.S. currency totaling $2.1 million from St. Thomas to St. Maarten. According to the caller, the money was destined for Afghanistan.

The portion of the affidavit upon which the parties have focused in this appeal are the allegations of tax fraud made in paragraphs 23 and 24. The Government now concedes that

these allegations were inaccurate.[5]   After receiving United's bank records, the Government moved the District Court to grant an ex parte order compelling VIBIR to produce United's tax returns based on the Employer Identification Number (EIN) listed in the Suspicious Activity Report.  The District Court signed the order on September 21, 2001, and VIBIR began producing records in October 2001.  VIBIR initially provided the Government with a copy of United's 1998 U.S. corporate income tax return and computer transcripts reflecting the gross receipts reported by United on monthly Virgin Islands returns filed during 1999 and 2000.[6]  United's 1998 U.S. corporate tax return reported gross receipts of approximately $41 million for 1998.  In contrast, the computer transcripts provided by VIBIR reflected that United had reported gross receipts of $270,000 in 1998.  (App. 672-73.)  Thus, for the year 1998, there appeared to be a difference of over $40 million between the gross receipts reported on the 1998 U.S. corporate tax return and the 1998

---

[5]Paragraph 23 of the affidavit alleged that United had underreported its tax obligations, substantially inflated its revenues in connection with a loan application, and failed to file U.S. corporate income tax returns in 1999 and 2000.  Paragraph 24 of the affidavit relied upon the allegations set forth in paragraph 23 to allege that United had submitted false financial statements to the Bank of Nova Scotia's headquarters in Toronto, in violation of various provisions of federal law.  (App. 397-98.)

[6]In the Virgin Islands, a 4% gross receipts tax is imposed on retail businesses.  Businesses such as United are required to file a monthly gross receipts tax return.  (App. 534.)

Virgin Islands gross receipts returns.  In addition, computer transcripts provided by VIBIR reflected that United reported gross receipts of $3.7 million in 1999 and $8.3 million in 2000. The Government, however, had copies of loan documents that United had furnished to the Bank in February 2000, stating gross receipts of approximately $47 million in 1999 and forecasting gross receipts of $54 million for 2000.  (App. 397.)

VIBIR did not produce United's 1999 and 2000 U.S. corporate tax returns, and, prior to the time that the Government filed an application for the search warrant, VIBIR officials repeatedly informed the FBI agents investigating the case that United had not filed corporate tax returns for 1999 and 2000. (App. 397, 552-53.)  Those representations turned out to be inaccurate.  VIBIR later learned that United's tax returns were maintained under more than one EIN, and the agency conceded that it mistakenly did not produce all of the documents requested under the ex parte order.  These tax returns, uncovered after a search of the Plaza Extra stores, revealed that United had reported $39,120,091 in gross receipts in 1998, as opposed to the $270,000 reflected on the computer printouts; $43,967,171 on its 1999 returns; and $49,211,159 on its 2000 returns.  In addition, the search yielded United's U.S. corporate tax returns from 1998 through 2000.  When all of these documents were uncovered, it became clear that the search warrant affidavit erroneously set forth that United underreported its income on the Virgin Islands gross receipts returns by $54 million, when in actuality the alleged difference was $7,159,580.  (*See* Goverment's Br. at 12-13.)

13

B.

The grand jury handed down the original indictment in this case on September 18, 2003. On September 9, 2004, the grand jury returned a seventy-eight count superseding indictment that charged defendants with various federal criminal offenses. Thereafter, defendants filed a motion to suppress evidence, or in the alternative a motion for a *Franks* hearing, to determine whether Agent Petri made knowingly false or reckless misrepresentations in the affidavit of probable cause. After extensive briefing from both parties, an evidentiary hearing, and oral argument, the District Court found that Agent Petri had made the false statements in paragraphs 23 and 24 with reckless disregard for the truth.

The District Court then reformulated the affidavit, striking out paragraphs 23 and 24. The District Court concluded that, without those paragraphs, the affidavit did not contain sufficient allegations to establish probable cause that defendants engaged in money laundering. It stated that the allegations regarding the discovery of $7 million in a safe during a raid of the St. Thomas Plaza Extra store in 1999 did not support an inference that United was laundering money, but rather that an equal inference could be drawn that United was "holding the money for some other legal purpose – such as paying vendors or cashing customer's and employee's checks. . . . If anything, this tends to show that the money viewed in the safe in 1999 was periodically deposited between January 2000 and August 2001, controverting the Affiant's money laundering insinuation." (App. 20.) The District Court also dismissed the evidence of currency deposit fluctuations throughout the course of 2000 and

14

2001, explaining that the currency fluctuations and the checks to Hamdan could have been to repay a loan. Finally, the District Court dismissed the allegations in paragraph 25 regarding the $2.2 million deposited by the middle eastern merchants in St. Maarten as vague because the warrant affidavit did not "indicate what evidence would likely be found in the locations to be searched that would prove or disprove that Fathi Yusuf deposited money in St. Maarten as part of a money laundering scheme." (App. 21.) Notably, the District Court did not even bother to address in its opinion the fact that the money was deposited solely in $50 and $100 denominations.

As a result of these findings, the District Court suppressed all of the evidence that was obtained as the fruits of the search warrants. This decision effectively dismissed the Government's case. The Government appealed.[7]

---

[7]The District Court had original jurisdiction over the charged offenses pursuant to 18 U.S.C. § 3231 and 48 U.S.C. § 1612. We have appellate jurisdiction over the Government's appeal from a final order of the District Court suppressing evidence pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1294(3).

Also pending before this court is a motion to remand the case to the District Court to augment the record regarding Agent Petri's alleged recklessness. In a separate order issued today, we deny that motion without prejudice to defendants' right to bring additional motions before the District Court if relevant to the matter at hand and not inconsistent with this opinion. We note, however, that our decision in Part II.C of this opinion likely moots any further motion brought to challenge Agent Petri's bad faith since the reformulated affidavit contained

II.

A.

The Warrant Clause of the Fourth Amendment to the United States Constitution provides in pertinent part that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation." U.S Const. amend. IV. It has been referred to by the Supreme Court as the "bulwark of Fourth Amendment protection." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).

In *Franks*, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant. There, the Court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid. First, the defendant must make a "substantial preliminary showing" that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause. *Id.* at 171.[8] At the hearing, the defendant

probable cause to search the United grocery store locations for corporate business records.

[8]In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses. *Id.*

16

must ultimately prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171-72).

The Supreme Court in "*Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake [is] insufficient.'" *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (quoting *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979)). In *Wilson*, we set forth standards to identify what constitutes "reckless disregard for the truth" regarding both misstatements and omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

---

The parties in this case do not dispute that a *Franks* hearing was appropriate based upon the information submitted by the defendant.

*Id.* at 783. The latter standard is similar to the actual malice standard set forth in First Amendment defamation claims. *Id.* at 788.

In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding. *Id.* We have recognized a distinction between misrepresentations and omissions for purposes of determining whether deficiencies in the affidavit are "material." When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit." *Id.* at 400.

If the defendant is able to ultimately meet this burden, "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable case was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

B.

Our task in the present case is to determine whether the District Court erred in finding that the misstatements in paragraphs 23 and 24 of the affidavit were made recklessly. It is clear from the record that the FBI had some concerns regarding the discrepancies between the 1998 U.S. corporate tax return and the 1998 Virgin Islands gross receipts return, as well

18

as the figures it had for United's gross receipts returns it received from VIBIR for 1999 and 2000. Agent Petri submitted an affidavit that he "returned to the VIBIR offices on multiple occasions in an attempt to determine a reason for the large discrepancies." (App. 409.) Although the VIBIR disclosure officer was unable to explain the reasons for the discrepancies, Agent Petri claimed that "[o]n each visit I was assured that the United Corporation gross receipt tax information previously provided pursuant to the Ex Parte order were [sic] complete for United Corporation, dba Plaza Extra." (App. 409.) In addition, Agent Petri designated one of his agents, John Ware, as a liaison to report to VIBIR on a "daily basis . . . to collect all documents that were requested in the ex parte order." (App. 537.) VIBIR officials repeatedly assured the FBI that the gross receipts figures reported on the computer transcripts reflected the information submitted in the actual returns. Despite these repeated assurances, the District Court viewed Agent Petri's inability to obtain a satisfactory explanation from VIBIR as indicative of recklessness. (App. 25.)

The District Court also focused on the fact that Petri did not obtain an additional court order or subpoena United, any of the individual defendants, or United's accountant to obtain United's underlying gross receipts tax returns for 1998 through 2000 and the U.S. corporate tax returns for 1999 and 2000. Petri explained at the *Franks* hearing that he did not request such information from defendants prior to the search so as not to compromise the ongoing criminal investigation, and that a further court order would have been futile because the District Court had already entered the ex parte order. (App. 538, 553.)

19

We find that the District Court erred in concluding that the statements in the affidavit were made recklessly, particularly because the District Court did not take into account the nature and source of the information obtained by Agent Petri. Courts have routinely recognized a distinction between information provided by an informant and that provided by a law enforcement officer or other government agency. Informants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation. *See*, *e.g.*, *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005) ("Where corroboration or independent investigation after receipt of an anonymous tip is lacking – and thus the predictive value of the tip goes untested before a warrant is issued – courts have found officers' subsequent reliance on the warrant unreasonable."). In contrast, information received from other law enforcement officials during the course of an investigation is generally presumed to be reliable. *See United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); *United States v. Hodge*, 354. F.3d 305, 311 (4th Cir. 2004) ("[S]tatements of other law enforcement officers 'are plainly . . . reliable' even without any special showing.") (citation omitted); *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997) ("[L]aw enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime."); *United States v. Davis*, 557 F.2d 1239, 1247 (8th Cir. 1977) (finding

20

that a DEA agent was entitled to rely upon information provided to him by a Minneapolis police officer in submitting an affidavit for probable cause).[9]

The present case deals with information supplied by a sister governmental agency pursuant to court order. Under these circumstances, we believe that a flexible standard, taking into consideration the inherent reliability of the information provided by sister governmental agencies, as well as the possibility that such agencies might respond to a court order with inaccurate information, should be applied to determine whether a government agent acted recklessly by including specific information in an affidavit of probable cause. Certainly, information received from another governmental agency may raise questions as to its accuracy and require an agent to undertake further investigation, and we explicitly decline to adopt a rule that information obtained from a sister

---

[9]We recognize the line of cases beginning with *Whitely v. Warden*, 401 U.S. 560 (1971), which hold that reliance upon another officer's assertion that probable cause exists to make an arrest does not determine conclusively whether the arrest was legal. *See id.* at 568 (stating that "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest"). We are faced with a different analysis in this case. Here, the focus is on Agent Petri's mental state when he submitted the affidavit to the magistrate judge, not "whether the law enforcement system as a whole has complied with the requirements of the Fourth Amendment." 2 LaFave, *Criminal Procedure*, § 3.3(e) (2d ed. 1999).

21

governmental agency pursuant to a court order is *per se* reliable. Rather, we conclude that a defendant is required to demonstrate initially that the information provided by the agency would have put a reasonable official on notice that further investigation was necessary. If the defendant can meet this initial burden, the defendant must point to additional objective factors, suggesting that the agent's subsequent inquiry would have rendered the agent's reliance upon that information unreasonably reckless.

In this case, it is clear that the discrepancy between United's 1998 U.S. corporate income tax return, which reported income of approximately $41 million, and United's 1998 monthly gross receipts, which totaled $270,000, would have placed a reasonable official on notice that further investigation was necessary. A difference of over $40 million in reported earnings is so excessive as to cause a reasonable person to search for corroboration and an explanation. Indeed, Agent Petri conceded as much at the *Franks* hearing, and the Government has focused our attention in this case on Agent Petri's subsequent investigation in support of its argument that his actions were not reckless.

The fact that further investigation was required, however, does not demonstrate recklessness. In the context of a sister agency's response to a court order, the substance of an agent's particular investigation is pertinent as to whether the agent's insertion of an inaccurate allegation into the affidavit of probable cause was reckless. We find two factors to be particularly helpful to address this inquiry: (1) whether a reasonable agent would have been aware of a systemic failure on the agency's part to produce accurate information upon

22

request; and (2) whether the agent's particular investigation into possibly inaccurate information would give rise to an obvious reason to doubt the accuracy of the information.

The first factor focuses on external considerations independent from the particular facts of the ongoing investigation. Such considerations include, *inter alia*, whether the agent is aware that the agency has a history of providing inaccurate information to the investigating agent or other officers, and whether the agency lacks necessary procedural safeguards to ensure that the information it provides is accurate. The second factor focuses on the particular investigation conducted by the agent in the face of information that a reasonable officer would realize required further inquiry regarding its accuracy. Considerations under this factor may include the quality of the agent's attempts to validate the information, the source and nature of the information requested, and whether there exists a reasonably plausible explanation for the information provided by the governmental agency.

Applying each of these factors to the present case, we conclude that Agent Petri did not act recklessly by including paragraphs 23 and 24 in the affidavit. As an initial matter, we disagree with the District Court's belief that Agent Petri's lack of prior experience with VIBIR should be viewed as indicative of recklessness. To the contrary, it demonstrates that Agent Petri was unaware of any reason to doubt the accuracy of information provided by VIBIR pursuant to a court order. When combined with evidence that no other agents in Petri's field office, nor any prosecutor in the United States Attorney's Office, had ever dealt with or encountered problems with the

23

accuracy of VIBIR gross receipts printouts, the record is devoid of any systemic failure on VIBIR's part to provide accurate information upon request.

Moreover, the evidence presented to the District Court does not lead us to conclude that Agent Petri's particular investigation into the possibly questionable information gave rise to an obvious reason to doubt that the information was correct. Here, Agent Petri undertook a thorough investigation to determine whether VIBIR provided accurate information in response to the ex parte order. Agent Petri personally met with the VIBIR disclosure officer on several occasions in an effort to explain the discrepancy. (App. 409, 537.) Agent Petri also met directly with the VIBIR director and sent Agent Ware to the VIBIR offices on an almost-daily basis to gather information contained in the ex parte order. (App. 551.) On repeated occasions, VIBIR assured Agent Petri that United only had one tax identification number, that all of United's returns shared the same number, and that the monthly gross receipts printouts were those provided by United. (App. 409, 536, 568-69.) When Petri inquired further regarding whether he could obtain the actual gross receipts returns, VIBIR told him that it was able only to produce the printouts. (App. 537.) As Agent Petri testified, "VIBIR insisted that . . . Plaza Extra, doing business as United Corporation, had not filed their taxes and they could not find their tax returns," going so far as to give Agent Petri a written certification that they were unable to uncover the returns. (App. 551, 555-56.) As a result, Agent Petri exhausted all reasonable

24

investigatory options to corroborate the information that VIBIR provided.[10]

Additionally, the source and nature of the information requested and obtained by the Government provides further support for Petri's actions. VIBIR did not disclose United's tax records voluntarily, but rather was required to do so because of an independent court order. This fact is important, as it detracts from any possible allegations that VIBIR and the FBI colluded to produce false information in the affidavit. Nor did VIBIR initiate the investigation with the FBI, which helps allay concerns that VIBIR deliberately provided false information to the FBI to cover up bad faith or improper motive. *See*, *e.g.*, *Franks*, 438 U.S. at 163 n.6 (warning against the dangers of the police "insulat[ing] one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity") (quoting *Rugendorf v. United States*, 376 U.S. 528, 533 n.4 (1964)).

---

[10]We disagree with defendants that the Government was required to return to the District Court to obtain an order to enforce the previously filed ex parte order. There is no evidence that VIBIR complied with the ex parte order in bad faith. Rather, it appears that sloppy record-keeping prevented the agency from uncovering the correct information. In addition, we agree with the Government that Agent Petri was not required to subpoena defendants or their agents directly to obtain the tax records in the face of an ongoing investigation into serious criminal allegations.

25

Finally, a review of the record reveals a reasonably plausible explanation for the incorrect information provided by VIBIR at the time that Agent Petri submitted the affidavit to the magistrate judge:  that United had underreported its gross receipts to VIBIR for 1998 through 2000.  Our review demonstrates that Petri undertook his investigation with some skepticism, but that he and his fellow agents were assured at every possible investigatory avenue that the records provided by VIBIR were accurate.  Agent Petri and his fellow officers did not simply "go through the motions," but diligently pressed VIBIR to ensure that the information was correct.  Agent Petri testified at the *Franks* hearing that he attempted to disprove the validity of the figures provided by VIBIR.  (App. 557.)  After being assured repeatedly by VIBIR that the information was accurate, Agent Petri was left with the eminently plausible conclusion at that point in the investigation that United had underreported its gross receipts returns.  That this information later turned out to be incorrect because of VIBIR's internal mistakes is not determinative, as we focus our analysis under *Franks* on whether a reasonable officer in Agent Petri's position would have had an obvious reason at the time he submitted the affidavit to doubt the accuracy of the information.  No such reason existed in this case.

For all of these reasons, we find that the District Court erred by determining that the misstatements in paragraphs 23 and 24 were made recklessly by Agent Petri.[11]

_____

[11]Defendants argue, and the District Court agreed, that Agent Petri omitted material information in the affidavit: namely, that he did not inform the magistrate judge that he was

C.

The disconcerting part of our analysis of the District Court's decision is that the ultimate determination of whether the assertions in paragraphs 23 and 24 were made with reckless disregard for the truth is inconsequential. The reformulated affidavit clearly establishes probable cause to authorize the

uncomfortable with the discrepancies in the data. We disagree. Agent Petri's purported omission consists of his alleged subjective misgivings regarding the quality of the information he received from VIBIR. A review of the affidavit reveals, however, that Agent Petri did not omit any material information in the affidavit, as paragraph 23 contains the discrepancy between the income tax filings and the gross receipts. Our cases dealing with purported material omissions have not recognized that an agent is required to set forth his subjective misgivings regarding information in the affidavit; rather, those decisions have focused on whether the agent recklessly omitted objective information that is material to the magistrate judge's determination of probable cause. *See Wilson v. Russo*, 212 F.3d 781, 791 (3d Cir. 2000) (omitting fact that eyewitness spotted defendant in a different location while a crime was ongoing); *Sherwood v. Mulvihill*, 113 F.3d 396 (3d Cir. 1997) (omitting fact that officer directed third party to make drug purchase); *United States v. Frost*, 999 F.2d 737, 743-44 (3d Cir. 1993) (omitting fact that drug dog was not "alerted" to alleged courier's suitcase).

27

search warrants.[12]  Even if this Court were to strike paragraphs

[12]We note that it would be improper to reformulate the affidavit with the "correct" gross receipts figures reported in United's 1998 through 2000 Virgin Islands tax returns to show a $7.16 million difference between what was reported on United's Virgin islands gross receipts returns and what was reported on its 1998 through 2000 U.S. corporate income tax returns.  The Government contends that information allegedly indicating that United had underreported its gross income by $7.16 million would have established probable cause to issue the warrants.  Defendants, in contrast, assert that it would be improper to reformulate the affidavit with the "corrected" figures because the Government would not be deterred by its own misconduct.

We agree with defendants.  The purpose of *Franks* and its progeny is to deter law enforcement personnel from including recklessly false information in affidavits of probable cause.  If an agent provides recklessly false information, the government should not get the benefit of the fortuitous circumstance that evidence obtained as a result of the defective search warrant *would have been sufficient* to establish probable cause had it been contained in the original affidavit.  The Government's argument assumes that the tail can wag the dog, i.e., that we can consider the corrected information.  This argument is flawed, however, because the magistrate judge is limited to the facts submitted in the affidavit in making a determination of probable cause.  *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).  Indeed, in reviewing whether the magistrate had a "substantial basis" to issue the warrant, we are limited to reviewing the affidavit and cannot "consider information from

28

other portions of the record." *Id.*; *see also United States v. Button*, 653 F.2d 319, 326 n.8 (8th Cir. 1981). If we were to "correct" the affidavit as suggested by the Government, we would not only be infusing extraneous information into the probable cause determination, but we would also allow the Government to receive the benefit of its misconduct. *See Nix v. Williams*, 467 U.S. 431, 443 (1984) (explaining that the purpose of the exclusionary rule is to ensure that "the prosecution is not put in a better position than it would have been in if no illegality had transpired"); *see also Baldwin v. Placer County*, 418 F.3d 966, 971 (9th Cir. 2005) (holding that a reformulated affidavit must be based upon information already contained in the warrant); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 4.4(c) (4th ed. 2004) (stating that an affidavit that contains knowing falsehoods "should not be open to rehabilitation by a process of substituting for the affiant's lies other information which is really the truth from which he deliberately departed"). That result is not endorsed by *Franks*, which requires courts to "set to one side" the affirmative misstatements and determine whether the remaining information in the affidavit supports a finding of probable cause. 438 U.S. at 155; *see also Baldwin*, 418 F.3d at 971.

Additional information may be incorporated into an affidavit only if we determine that a government agent made a material omission. The reason for the distinction between omissions and misrepresentations is that an omission cannot be excised; rather, the omitted information is introduced into the affidavit in order to determine whether the omission was material. *See Sherwood*, 113 F.3d at 400. *See also* 2 LaFave, *supra*, § 4.4(c) (noting that the outcome in *Franks* challenges

29

23 and 24 from the affidavit, there are sufficient factual allegations of money laundering to support a finding of probable cause to search the three Plaza Extra supermarkets for corporate business records.

The redaction process set forth in *Franks* is designed to determine whether there existed a causal connection between the misrepresentation and the challenged search. *United States v. Calisto*, 838 F.2d 711, 715 (3d Cir. 1988). Essentially, the process helps us determine whether the misrepresentation was material, i.e., whether it mattered regarding the magistrate's probable cause determination. In this case, our focus is further narrowed based on the Government's representation that it is going to introduce in its case-in-chief only "evidence of business records seized . . . from the Plaza Extra store locations[.]" (Government's Br. at 50; App. 347.)[13] Because the Government

may turn on whether the defect is a material omission or a misstatement). Because the alleged misconduct in this case focuses on misstatements by a government agent, rather than omissions, we will not reformulate the affidavit with the "corrected" gross tax receipts information.

[13]This evidence, seized from the supermarkets as a result of the search, "consists primarily of corporate business records," including: (1) financial records, such as general ledgers, financial statements, balance sheets, bank statements, checks, reconciliations, and payroll checks; (2) sales records, such as computer and handwritten records of company sales; credit card receipts; (3) tax records, such as income, gross receipt and employment tax returns; (4) purchase records, such as sales

is bound by its declaration that it will not use evidence in its case-in-chief seized from the other locations listed in the search warrants, we need not examine whether the search and seizure of items from those locations was supported by probable cause.[14] This course of action is commensurate with our existing precedent. In *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982), we held that where the evidence authorized to be seized exceeds the underlying probable cause justification, the proper course is for the court to redact that information from the affidavit of probable cause. We explained in *Christine* that:

> By redaction, we mean striking from a warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment. Each part of the search authorized by the warrant is examined separately to determine whether it is

invoices and cash ledgers; and (5) cash found in the safes at the Plaza Extra locations. (*See* App. 348.)

[14]As a result, the Government will be precluded from introducing during its case-in-chief any evidence seized from the following locations: Fathi Yusuf's principal residence in Christiansted, St. Croix; Waleed Hamed's residence in Christiansted, St. Croix; Waheed Hamed's residence in St. Thomas; the persons of Fathi Yusuf, Waleed Hamed, and Waheed Hamed; and the two safe deposit boxes in the name of Maher F. Yusuf in the Bank of Nova Scotia, St. Croix. (App. 391, 401.)

31

> impermissibly general or unsupported by probable
> cause. Materials seized under the authority of
> those parts of the warrant struck for invalidity
> must be suppressed, but the court need not
> suppress materials seized pursuant to the valid
> portions of the warrant.

*Id.* at 754. Thus, our course in this case will mirror that taken in *Christine*, and we will consider the validity of the search warrant solely with respect to the corporate business records and cash seized from the three Plaza Extra stores.

Our focus, then, is whether the reformulated affidavit established probable cause to search the three Plaza Extra Supermarkets. In conducting this analysis, we must examine the "totality of the circumstances" as set forth in the affidavit. *Ritter*, 416 F.3d at 262. Under this flexible standard, "the task . . . is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). That determination does not require absolute certainty that evidence of criminal activity will be found at a particular place, but rather that it is reasonable to assume that a search will uncover such evidence. *Ritter*, 416 F.3d at 263; *see also United States ex. rel Campbell v. Rundell*, 327 F.2d 153, 163 (3d Cir. 1964) ("[P]robable cause which will justify the issuance of a search warrant is less than certainty of proof, but more than suspicion or possibility, the test being whether the allegations of the

32

supporting affidavit warrant a prudent and cautious man in believing that the alleged offense has been committed.") (citation omitted).

Both this Court and the United States Supreme Court have warned against the practice of "overly compartmentaliz[ing]" the determination of probable cause. *In re Application of Adan*, 437 F.3d 381, 397 n.7 (3d Cir. 2006). The probable cause determination is to be made only after considering the totality of the circumstances, which requires courts to consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences. *United States v. Arvizu*, 534 U.S. 266, 275 (2002). In *Arvizu*, for example, the Supreme Court rejected the Ninth Circuit's approach of individually weighing and considering in isolation each of the factors relied upon by a government agent to stop a vehicle for possible immigration smuggling offenses. The Supreme Court explained that such an approach was inconsistent with a totality of the circumstances approach:

> The [Court of Appeals'] evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase. The court appeared to believe that each observation by [the agent] that was by itself readily susceptible to an innocent explanation was entitled to "no weight." *Terry*,

33

however, precludes this sort of divide-and-conquer analysis.

*Id.* at 274.[15]

In this case, the District Court erroneously applied the divide-and-conquer approach rejected by the Supreme Court in *Arvizu* by examining each of the allegations in the affidavit *seriatim* rather than collectively. We conclude that the information set forth in the affidavit provides probable cause that evidence of money laundering would be found at the three Plaza Extra stores.

Agent Petri's affidavit alleged that United's principals made large currency deposits inconsistent with the corporation's usual business practices on several occasions between April 2000 to August 2001. Importantly, those deposits – from a retail grocery chain – were made *solely* in $50 and $100 denominations. We cannot understand why this critical fact was overlooked by the District Court. It is utterly incomprehensible that a retail supermarket chain receives and deposits cash only

[15]The fact that the Court's decision in *Arvizu* reviewed whether the agent had reasonable suspicion, as opposed to probable cause, to stop the vehicle is immaterial. We focus in this case on application the totality of the circumstances approach, which is used in both the determination of both probable cause, *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001), and of reasonable suspicion, *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002).

in such large denominations.[16]   The nature of the business certainly entails receiving currency from customers in smaller denominations, and the absence of *any* smaller denominations deposited on these two occasions makes it reasonable to assume that this money was not tied to legitimate grocery sales.

This fact is compounded by the manner in which the April 2001 deposits were structured.  Although cash deposit slips were made out in advance and dated for seven consecutive days between April 12 and April 18, the seven deposits were made over a four-day period.  In addition, the deposits were made separately in similarly rounded amounts ($225,000, $250,000, $300,000, and $315,000) that more closely resembled normal deposits.  Based on his twelve years of experience, as well as his specialized training in money laundering investigations, Agent Petri explained that this evidence strongly implied "that the $1,940,000 cash was originally structured into smaller deposit amounts in order to create an appearance of deposits more consistent with the normal business activity, as opposed to a one-time bulk deposit."  (App. 397.)

Moreover, the information from the August 1999 INS search provides a useful historical reference point consistent

---

[16]At oral argument, defendants' counsel attributed the large number of $50 and $100 bills deposited to extra cash brought in by the Carnival celebration that took place in the Virgin Islands during April 2001.  Even assuming that the Plaza Extra stores generated greater revenues during Carnival, defendants failed to provide *any* viable explanation why the deposits were made solely in $50 and $100 bills.

35

with United's continuing practice of having large, unexplained amounts of cash in $50 and $100 denominations. *See*, *e.g.*, *Ritter*, 416 F.3d at 263 (permitting court to consider agent's observation of narcotics activity at the situs eight months earlier in the probable cause analysis because later search involved similar type of criminal narcotics offense). We disagree with defendants that the information relating to the August 1999 search, which uncovered $3 million to $7 million in denominations of $50 and $100 bills, was stale. Although the "[a]ge of the information supporting a warrant application is a factor in determining probable cause . . . [a]ge alone . . . does not determine staleness." *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993). The facts and circumstances of each individual case must be considered. *Id.* We have noted generally that the mere passage of time does not render information in an affidavit stale where: (1) the facts suggest that the activity is of a protracted and continuous nature, *United States v. Tehfe*, 722 F.2d 1114, and (2) the items to be seized were created for the purpose of preservation, e.g., business records, *United States v. Williams*, 124 F.3d 411, 421 (3d Cir. 1997). *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 148 (3d Cir. 2002) (holding that eleven-month gap between criminal activity and execution of the warrant did not render the affidavit stale because the relationship between the defendant and the criminal enterprise was "of considerable duration" and the warrant authorized a search for business records, which are typically retained for an extended period of time). In this case, the warrant application sought permission to search for United's corporate business records, which are likely be kept for a longer time period than

36

other types of physical evidence due to general business and accounting practices. *See Christine*, 687 F.2d at 760. The August 1999 INS search, thus, provides a link between the alleged current criminal activity and similar activity that took place over the preceding twenty months, suggesting a pattern of activity that was continuous in nature.

Finally, the affidavit lists several allegations that, when taken together with the unexplained currency deposits, provided probable cause for the magistrate judge to issue the search warrants. During the same period in which United was depositing the unusually large currency amounts in large denominations, Waleed Hamed signed two checks totaling $1.9 million on behalf of United payable to "Hamdan Diamond Corp." Hamdan is a retail business located in St. Maarten, Northern Antilles, owned in part by Fathi Yusuf, who is the sole signatory of Hamdan's account.[17] A reliable foreign services agency informed the FBI that its investigation had uncovered that Yusuf was part of a network of Middle Eastern merchants who owned retail businesses in St. Maarten. According to the agency, these merchants made cash deposits of over $2.2 million into their respective accounts in 2000, an amount far in excess of the legitimate cash proceeds of their retail sales. The foreign services agency concluded that the merchants were laundering U.S. currency through their retail businesses. When combined

---

[17]Defendants contend that Hamdan Diamond Corporation is neither owned by Yusuf nor a St. Maarten retail business. That fact, however, was not challenged in the *Franks* hearing below. As a result, we accept the fact as true for purposes of examining the reformulated affidavit of probable cause.

with this historical backdrop, the cash deposits in $50 and $100 bills and contemporaneous check to Hamdan suggest that United's activities in April 2001 were an attempt to launder cash proceeds through an offshore corporation in St. Maarten.

Based upon all of the allegations in the affidavit, considered *in toto*, a reformulated and redacted affidavit would establish probable cause for the Government to search for corporate business records at the three Plaza Extra stores. Thus, we would reverse the decision of the District Court even in the absence of our finding that the allegations in paragraphs 23 and 24 were not made recklessly.

### III.

Apart from whether the warrants contained sufficient allegations to establish probable cause is the question of whether the warrants were drafted with sufficient particularity with respect to the property to be searched and the items to be seized. Defendants argue that any evidence the Government intends to introduce at trial should be suppressed in its entirety because the warrants were general warrants.[18] Defendants advance three

---

[18]Although the District Court did not reach the general warrant issue below because of its decision following the *Franks* hearing, we consider the issue at this time because the factual record is fully-developed and the purely legal question is necessary to our resolution of the appeal. *See Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 159 (3d Cir. 1998) ("When a district court has failed to reach a question below that becomes critical when reviewed on appeal, an

arguments in support of this proposition:  (1) the warrants do not state with particularity the property to be searched and seized; (2) the warrants fail to identify the crimes committed by reference to the statutory elements in the United States Code; and (3) the catch-all provision in the warrants, which allowed the agents to search for any evidence of "money laundering and illegal activities," unconstitutionally gave the agents unfettered discretion to conduct their search.

The Fourth Amendment provides that warrants must "particularly describ[e] the place to be searched and the persons or things to be seized."  U.S. Const. amend. IV (emphasis added).  General warrants violate the Fourth Amendment because they essentially authorize "a general exploratory rummaging in a person's belongings."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  For example, warrants requesting to search for the following materials have been struck down as general warrants:  (1) evidence of "smuggled goods," *Boyd v. United States*, 116 U.S. 616 (1886); (2) evidence of "obscene materials," *Marcus v. Search Warrant*, 367 U.S. 717 (1961); (3) evidence of "books, records, pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments concerning the Communist Party of Texas," *Stanford v. Texas*, 379 U.S. 476 (1965); (4) evidence of "illegally obtained films," *United States v. Cook*, 657 F.2d 730 (5th Cir. 1981); and

---

appellate court may sometimes resolve the issue on appeal rather than remand to the district court.  This procedure is generally appropriate when the factual record is developed and the issues provide purely legal questions, upon which an appellate court exercises plenary review.") (citations omitted).

(5) evidence of "stolen property," *United States v. Giresi*, 488 F. Supp. 455 (D.N.J. 1980), *aff'd*, 642 F.2d 444 (3d Cir. 1981). Defendants' three arguments essentially contend that the warrants in this case violated the particularity requirement, giving government agents unfettered discretion to search the three Plaza Extra stores.[19]

Defendants' first argument is that the warrants failed to incorporate the Petri affidavit and did not otherwise explicate the facts constituting the enumerated crimes. They argue that we should apply the Supreme Court's recent decision in *Groh v. Ramirez*, 540 U.S. 551 (2004), to invalidate the search warrant because the affidavit in this case was not incorporated into the

---

[19]There is a legal distinction between a general warrant, which is invalid because it vests the "executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's] papers in search of criminal evidence," and an overly broad warrant, which "'describe[s] in both specific and inclusive general terms what is to be seized," but "authorizes the seizure of items as to which there is no probable cause." *Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d at 149 (quoting *Christine*, 687 F.2d at 753-54). As discussed above, an overly broad warrant can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment. *Id.* In contrast, the only remedy for a general warrant is to suppress all evidence obtained thereby. *Id.* at 758 ("It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed.").

search warrant. The facts in *Groh*, however, are clearly different from this case. In *Groh*, an ATF agent prepared and signed a detailed affidavit and application for a search warrant which stated that the purpose of the search was to find a number of illegal firearms. Although the application was extremely detailed and particularly described the place to be searched and the items to be seized, the warrant itself "failed to identify *any* of the items that [the agent] intended to seize." *Id.* at 554 (emphasis added). In addition, the warrant failed to incorporate by reference the list of items to be seized, which was enumerated in the application. *Id.* at 555. According to the Court, this defect was fatal: "The fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity." *Id.* at 557 (emphasis in original). The Court explained that a warrant may incorporate a supporting application or affidavit, so long as the warrant cross-references the supporting document and the document accompanies the warrant. *Id.* at 558.

From this holding, defendants contend that the warrant is invalid in our case because it did not incorporate the entire affidavit. The flaw in this argument, however, is that the warrant in this case did incorporate Exhibit B of the application, which was attached to each of the warrants. There is no question that the warrants in this case (like the warrant in *Groh*) particularly described the place to be searched. Unlike *Groh*, however, Exhibit B – which specifically identified the items that the government intended to seize – was also incorporated into the warrants. (*See* App. 380-82.) Had the same step been taken in *Groh*, the deficient warrant would have been remedied. Thus,

41

the problem which existed in *Groh* is simply not implicated in this case.

Because Exhibit B was incorporated into the affidavit, the next question becomes whether that exhibit particularly described the items to be searched. Defendants argue that the government did not narrow the categories of evidence sought to be searched because the warrant authorized the search for violations of broad federal statutes, including money laundering and various frauds, that encompass a wide-range of criminal conduct. According to defendants, the reference to these statutes, without any further limitation, transformed the warrants in this case into general warrants.

Defendants cite principally to the Tenth Circuit's decision in *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988), in which the court determined that a warrant was facially overbroad because it sought evidence of "the purchase, sale and illegal exportation of materials in violation of" federal export laws. *Id.* at 601. The principal failure of the warrant in that case was its singular reference to a broad federal statute without any meaningful limitations on the items to be searched. There, the government sought to search for records relating to the export of one product to China, and the government failed to include such limiting information in the warrant. *Id.* at 604.

In *United States v. American Investors of Pittsburgh*, 879 F.2d 1087 (3d Cir. 1989), a case similar to the present one, we distinguished the Tenth Circuit's decision in *Leahy*. In that case, the government sought twenty-three categories of documents as evidence of money laundering. The defendants

42

argued that the search was unconstitutionally overbroad. We disagreed, noting that a broad range of documents were required to be searched to "sort[] out the details of th[e] sophisticated scheme." *Id.* at 1106. We noted that "[t]he fact that the warrant authorized a search for a large amount of documents and records does not necessarily render the search invalid so long as there exists a sufficient nexus between the evidence to be seized and the alleged offenses." *Id.* at 1105-06. We explained that the holding in *Leahy* depended on the crucial fact that the government had information available "to make the description of the items to be seized much more specific." *Am. Investors*, 879 F.2d at 1106. Thus, in contrast to the warrant at issue in *Leahy*, the warrant in *American Investors* was as specific as possible under the circumstances:

> Here, given the range of information required to unravel the laundering scheme and the extent of participation by the parties, the warrant was as specific as circumstances would allow, however broad the requirements of the search might be. We cannot see how any more precise language in the affidavit could have limited the scope of the search authorized by the magistrate, despite the fact that the language of the warrant was broader than that of the affidavit.

*Id.*

Similarly, in *United States v. Kepner*, 843 F.2d 755 (3d Cir. 1988), we held that a search warrant seeking "documents, records, and personal effects" of the defendants in connection

43

with an investigation into violations of the Taft-Hartley Act was not impermissibly overbroad.  The items listed to be searched in the warrant were broader than in the application, which stated that the agent had probable cause that the search would result in "the seizure of personal items of [the defendant] such as clothing, documents, records, diaries, and correspondence that establish his use and control of the condominium unit as well as his illegal receipt of the prohibited benefits."  *Id.* at 757.  We determined that the warrant was drawn with sufficient particularity.  The key in that case was that *any* evidence that the defendant had a presence in the condominium on a regular basis would have been proof of a violation of the Taft-Hartley Act, which prohibits union officials to receive benefits from an employer.  As a result, the more precise language of the affidavit could not have served to limit the scope of the search authorized by the magistrate.  *Id.* at 762-63.

The holdings in each of these decisions recognize that the breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate.  After reviewing the application in the present case, we conclude that the warrants did not violate the particularity principle, as the warrants were limited in three respects:  (1) they specified that agents were searching for evidence of several specifically enumerated federal crimes; (2) the search was limited in time to evidence from 1990 to the date of the search in October 2001; and (3) the evidence sought was limited to records pertaining to: "United Corporation d/b/a Plaza Extra, Plessen Enterprises, Inc., Hamdan Diamond Corp., Sixteen Plus Corp. and any affiliated

44

companies as well as their principals, officers managers, and employees (including but not limited to Fathi Yusuf, Maher Yusuf, Waleed "Wally" Hamed, and Waheed "Willy" Hamed")."

Given the nature of the crime and the limitation on the items to be searched, the warrant here was drafted with sufficient particularity. It is important to remember that the government was conducting an investigation into money laundering and other complex white collar crimes. We have repeatedly stated that the government is to be given more flexibility regarding the items to be searched when the criminal activity deals with complex financial transactions. *See Christine*, 687 F.2d at 760 (stating that the flexibility inherent in the probable cause determination is "especially appropriate in cases involving corporate schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records"); *see also Am. Investors*, 879 F.2d at 1106 ("Given the complex nature of a money-laundering enterprise, we cannot say that the categories overdescribed the extent of the evidence sought to be seized.").

Indeed, it is difficult to conclude how the Government could have more narrowly tailored the warrant in this money laundering investigation. Like in *American Investors*, the government needed to search for a broad array of corporate documents to piece together United's unexplained large-scale currency deposits. The specific categories of corporate documents to be introduced at trial – financial records, sales records, tax records, and purchase records – are all probative of the cash flow coming into and going out of the Plaza Extra

45

Supermarkets, and could establish the massive white collar scheme the Government has alleged in this case. *See Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976) (stating that the government was investigating a "complex real estate scheme whose existence could be proved only by piecing together many bits of evidence," and accordingly that, "[l]ike a jigsaw puzzle, the whole 'picture' of [the unlawful scheme] . . . would be shown only by placing in proper place the many pieces of evidence that, taken singly, would show comparatively little"). Accordingly, we conclude that the warrants satisfied the particularity requirement with respect to the items to be searched.

Defendants' final argument is that the "catch-all" provision in paragraph 13 of Exhibit B, authorizing the government to search for evidence of "money laundering *and illegal activities*," renders the warrant unconstitutionally overbroad. In *Andresen*, the Supreme Court rejected a similar argument. The warrant in that case sought to search for items tending to establish the elements of the crime of false pretenses "together with other fruits, instrumentalities and evidence of crime at this (time) unknown." *Andresen*, 427 U.S. at 480 n.10. The Supreme Court concluded that the reference to an unknown crime in the warrant did not transform the warrant into a general warrant because the context of the warrant made clear the phrase "together with . . . crime at this time unknown" referred to the crime of false pretenses. *Id.* at 481-82.

The warrants in our case are even more specific than the warrant in *Andresen*. Our warrants state that the Government sought to search for evidence of money laundering *and* illegal

46

business activities." In Exhibit B, paragraph a., "illegal business activities" is defined as "Money Laundering and Conspiracy to Commit Money Laundering, Failing to Report Exporting of Monetary Instruments, Mail Fraud, Wire Fraud, Alien Smuggling, Food Stamp Fraud, and Conspiracy." (App. 402.) Thus, unlike the term "crime" in *Andresen*, which the Court had to view in context to determine that it referred to the crime of false pretenses, the term "illegal business activities" is specifically defined in the warrant. Accordingly, we will interpret paragraph 13 with respect to that specific definition. Under this interpretation, it is clear that paragraph 13 does not transform the warrants into general warrants.

IV.

The rule we adopt today recognizes the special quality of information obtained from a sister governmental agency pursuant to court order within the existing *Franks* framework. We stress that we do not adopt a *per se* rule that information obtained from a sister governmental agency will never be considered reckless. Such a conclusion would run counter to the teachings of *Franks* and its progeny and could possibly invite collusion among different agencies to insulate deliberate misstatements. The District Court erred in holding that Agent Petri's conduct was reckless in this case, however, because it did not take into consideration the nature and source of the information he received from VIBIR, as well as his reasonable subsequent investigation into the accuracy of the information. Although that information later turned out to be incorrect, we cannot conclude that Agent Petri's investigation would have

47

given a reasonable official an obvious reason to doubt its accuracy.

Apart from our finding that Agent Petri did not act recklessly, we also conclude that the District Court erred in determining that a reformulated affidavit would have lacked probable cause. The circumstances surrounding the large-scale currency deposits in April 2001, which were structured in advance of the deposits and made solely in $50 and $100 bills, clearly provided probable cause to search for corporate business records at the Plaza Extra locations, particularly given the historical link of similar past activity at the Plaza Extra stores, as well as information provided by a foreign services agency regarding recent suspect offshore deposits made by the principal defendant. Furthermore, we reject defendants' argument that the warrants were unconstitutional general warrants. The warrants were drafted with sufficient particularity because they explicitly incorporated an affidavit detailing the items that the government intended to search and seize. The government further limited the scope of the warrants by focusing on enumerated white collar federal offenses and by limiting the nature of documents sought to specific corporate records at the Plaza Extra stores over a ten-year time period.

For these reasons, we will reverse the decision of the District Court and remand for further proceedings consistent with this opinion.