**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**GELEAN MARK, VERNON FAGAN, aka "Culture," ALLEN DINZEY, aka "Mow," DAVE BLYDEN, aka "Kimbi," KEITH FRANCOIS, aka "Kibo," ALEXCI EMMANUEL, ROYD THOMPSON, aka "Killer," TYRONE ALEXANDER PRINCE, LEON BOODOO, and WAYNE SERIEUX, aka "Bruce," aka "Soldier," Defendants**

Criminal No. 2005-76

District Court of the Virgin Islands

Division of St. Thomas and St. John

February 23, 2007

769

770

772

DELIA L. SMITH, AUSA, St. Thomas, U.S.V.I., *For the Plaintiff.*

ROBERT L. KING, ESQ., St. Croix, U.S.V.I., *For the defendant Gelean Mark.*

STEPHEN A. BRUSCH, ESQ., St. Thomas, U.S.V.I., *For the defendant Vernon Fagan.*

BERNARD VANSLUYTMAN, ESQ., St. Thomas, U.S.V.I., *For the defendant Allen Dinzey.*

KARIN A. BENTZ, ESQ., St. Thomas, U.S.V.I., *For the defendant Dave Blyden.*

DOUGLAS C. BEACH, ESQ., St. Thomas, U.S.V.I., *For the defendant Keith Francois.*

JUDITH L. BOURNE, ESQ., St. Thomas, U.S.V.I., *For the defendant Alexci Emmanuel.*

LEONARD B. FRANCIS, ESQ., St. Thomas, U.S.V.I., *For the defendant Royd Thompson.*

GEORGE H. HODGE, JR., ESQ., St. Thomas, U.S.V.I., *For the defendant Tyrone Alexander Prince.*

CLIVE C. RIVERS, ESQ., St. Thomas, U.S.V.I., *For the defendant Leon Boodoo.*

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(February 23, 2007)

Before the Court are the suppression motions of defendants Gelean Mark ("Mark"), Vernon Fagan ("Fagan"), Alan Dinzey ("Dinzey"), Keith Francois ("Francois"), Alexci Emmanuel ("Emmanuel"), Dave Blyden ("Blyden"), Tyrone Alexander Prince ("Prince"), Royd Thompson ("Thompson") and Leon Boodoo ("Boodoo") (the "defendants").[1] Each defendant seeks suppression of any communications intercepted by wiretap pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2518 *et seq.*, ("Title III"). In addition, defendant Fagan seeks to suppress the physical evidence uncovered after his vehicle and his residence were searched by law enforcement. Francois also seeks suppression of all statements he made to law enforcement officers after his arrest. A suppression hearing was held on this matter on January 4, 2007, and January 5, 2007.

## I. FACTS

This case stems from a year-long investigation of illegal narcotics activity on the streets of the Savan area of St. Thomas, U.S. Virgin Islands ("Savan"). The investigation began in November, 2004, when Drug Enforcement Administration ("DEA") agents received information from confidential sources that a street level, open-air drug market was operating in the neighborhood. The confidential sources told the agents that defendants Dinzey, Thompson, and Prince had been selling cocaine,

---

[1] The Second Superseding Indictment (the "Indictment") in this matter also names Andrew Williams ("Williams") and Wayne Serieux ("Serieux") as defendants. However, Williams has plead guilty and Serieux has not yet been arrested. Therefore, the term "defendants" in this Opinion refers only to Mark, Fagan, Dinzey, Francois, Emmanuel, Blyden, Prince, Thompson, and Boodoo.

crack cocaine, and marijuana on General Gade, a street in the Savan neighborhood.

The DEA agents conducted surveillance of Savan from vehicles parked in covert locations. The agents stationed vehicles on steep hills in the surrounding area in order to look down upon General Gade without being detected. However, buildings and other obstructions often interfered with the view of the neighborhood from these high locations. The agents also conducted surveillance from vehicles on the streets in Savan.

DEA Agent Michael Goldfinger, who was involved in the investigation since its early stages, explained the difficulties with the ground surveillance at the suppression hearing:

> A: There were specific occasions where we set surveillance up in low areas of General Gade, all the known drug dealers on the street dispersed, with the exception of a few who sat down and just blatantly stared in our vehicle and tried to look through the tints of our windows.

(Suppression Hr'g Tr. 47, Jan. 4, 2007.)

In addition to the ground surveillance, from November 16, 2004, until February 15, 2005, the agents used a confidential informant to conduct several controlled purchases of narcotics. Agents were stationed in the area nearby when these transactions were conducted. Each deal was recorded and video-taped. During these controlled transactions, the informant purchased narcotics from defendants Prince, Thompson, and Dinzey.

Beginning on January 17, 2005, the agents also orchestrated and recorded a series of consensual phone calls between the confidential informant and Dinzey. During these calls, the informant requested his desired quantity of drugs, Dinzey gave him a price, and they agreed on a time and place to conduct the transaction. All of the consensual conversations were followed by controlled purchases as planned, except the final conversation. On March 16, 2005, the informant called Dinzey and asked if he could get a discount if he were to buy four ounces of crack cocaine per week—a larger amount than the informant had requested in the past. This conversation did not result in a controlled purchase.

776

At the suppression hearing, the prosecutor asked Agent Goldfinger, "[w]hat, if anything, did you do as a next approach in this investigation?" Agent Goldfinger responded:

> Well, during the course of this, we were able to obtain the phone number belonging to Mr. Allen Dinzey. We knew that at some point Mr. Allen Dinzey would have to make telephonic contact with his source of supply in order to achieve getting the cocaine which he distributed on the streets of Savan in St. Thomas, at which time we initiated a pen register on Mr. Dinzey's cell phone.

(*Id.* at 54.) The government obtained orders authorizing the use of both pen register and trap and trace devices on Dinzey's phone. The DEA agents monitored Dinzey's phone with these devices from January 12, 2005, through April 7, 2005.

By approximately March, 2005, investigatory techniques such as ground surveillance, controlled buys, pen registers, and recorded consensual conversations had become unsuccessful. At the suppression hearing, Agent Goldfinger explained:

> We continued to try [to use traditional means of investigation], but to essentially no avail, or our surveillances were, as we referred to it, burnt, meaning the targets of the investigation observed our vehicles or observed our people, or—it's very difficult on this island to do those conventional types of surveillance, based on the close-knit neighborhoods, extremely small streets, neighborhoods where everyone who lives here knows the vehicles and the people who belong in that neighborhood.

(*Id.* at 115.) At this time, the government decided to seek authorization for a Title III wiretap investigation.

The government sought and received authorization from this Court for wiretaps on three different cellular phone numbers used by defendants in this action.[2] The applications were accompanied by affidavits, which described the techniques used and information obtained during the investigation, as of the date the respective affidavits were executed. Each

---

[2] The phone numbers associated with Mark and Fagan were actually subscribed to individuals who are not parties to this action. However, the agents learned through surveillance that defendants Fagan and Mark were the only people placing calls from those cellular phones.

777

order required that all monitoring of wire communications be limited to communications relevant to the suspected drug trafficking activity pursuant to the minimization requirement of Title III. *See* 18 U.S.C. § 2518(3). Each order terminated upon the attainment of the authorized objective, or in any event, at the end of thirty days after the order was entered.

The first wiretap order was issued on April 19, 2005, for the interception of communications occurring over Dinzey's phone number. The government identified defendants Dinzey, Thompson, Prince, and Mark (amongst others) as "target subjects" of the electronic surveillance. Agent Goldfinger's affidavit described all targets except for Mark. Through this initial wiretap on Dinzey's phone, the agents intercepted a number of communications that they characterized as related to drug trafficking. Based on their interpretations of these conversations, the Agents identified Fagan as Dinzey's suspected supplier, and Blyden as a suspected mid-level drug dealer.

On May 24, 2005, the government received an extension of the initial Dinzey wiretap, as well as authorization for a separate wiretap on Fagan's cellular phone number. Fagan and Blyden were added as "target subjects" to both the Dinzey extension and the Fagan wiretap. The extension of the Dinzey wiretap intercepted conversations between Dinzey and Francois that caused the agents to suspect that Francois was involved in the drug trafficking organization.

Through the Fagan wiretap, the agents identified Mark as a suspected source of supply. With the help of a confidential informant, the agents used the Fagan wiretap to determine Mark's cellular phone number. The agents also identified Emmanuel as a suspected mid-level drug dealer who was suspected of working directly for Fagan.

On June 8, 2005, the government intercepted a call between Mark and Fagan, in which Mark instructed Fagan to check whether the vessel used by the United States Customs and Border Patrol Marine Enforcement officers ("Marine Enforcement") was docked or out on patrol in the waters off of St. Thomas. At approximately 8:00 p.m. Fagan called Mark and told him that "[e]verything is safe," to which Mark replied, "Ok[ay], I'll call him and tell him to leave now." Based on previously intercepted conversations and surveillance, the agents suspected that Fagan planned to pick up a shipment of drugs that Mark had arranged to be dropped off

near a dock at Coki Point. Accordingly, the agents set up surveillance near the Coki Beach area.

At approximately 9:05 p.m. on June 8, 2005, agents observed a white 1998 Mazda Millenia (the "Mazda"), driven by Fagan, travel to the Coki Beach. The agents observed no drug transaction or meeting between Fagan and any other person at Coki Beach. At 9:10 p.m., the Mazda exited the Coki Beach area at a high rate of speed. The agents followed the Mazda traveling north on Coki Beach Road, toward Smith Bay. However, by 9:16 p.m., the agents had lost sight of the Mazda. At 9:19 p.m., agents intercepted a call in which Fagan told a friend of his that he was going to hide out for awhile, and expressed concern about where his Mazda would be parked for a day or two.

At approximately 10:30 p.m., the agents located the Mazda outside Emmanuel's residence in the Paul M. Pearson housing projects in St. Thomas, U.S. Virgin Islands. The vehicle was unoccupied. Additionally, neither Fagan, Emmanuel, nor any other person was present in the vicinity of the Mazda at that time. The agents subsequently searched the vehicle and found approximately one ounce of cocaine.

The final wiretap order was issued on July 7, 2005, this time for Mark's cellular phone. Emmanuel was added as a "target subject" of the Mark wiretap.

During the course of the investigation, the agents received written consent authorizing a search of Fagan's residence from an individual who identified himself as the owner of the residence. The agents thereafter searched the premises and found drug ledgers and paraphernalia in Fagan's bedroom.

On October 3, 2005, the government filed a criminal complaint against the defendants in this Court. The agents also obtained warrants to arrest Mark, Fagan, Francois, Dinzey, Enmmanuel, Prince, Thompson, Boodoo, and Blyden. The defendants were thereafter arrested pursuant to the warrants.

The agents arrested Francois at 8:30 a.m. on October 6, 2005, at his place of business.[3] Francois was placed in a car with at least two DEA agents, including Agent Mark Joseph. During the thirty-minute car ride to the DEA office, Agent Joseph informed Francois that they shared a

---

[3] At the time of his arrest, Fagan was employed at the water treatment plant in Bovoni, St. Thomas, U.S. Virgin Islands.

family relationship. Agent Joseph inquired about Francois' family, and Francois responded by telling Agent Joseph the names of his mother and father. Francois and the agents arrived at the DEA field office at 9:00 a.m., where Francois was processed and placed in a room to be interviewed. Agent Joseph described the interview process:

[BY THE PROSECUTOR:]

Q: What was the first approach? What did you do after having put him in the office for his interview?

A. I believe we played him ... tape[s].

...

A. They came from the Title III wire.

Q. And whose voices were recorded on those tapes?

A. Mr. Francois and Mr. Dinzey.

(Suppression Hr'g Tr. 83 (Jan. 5, 2007).) At approximately 9:45 a.m., after the agents played Francois tapes of the intercepted conversations, they advised him of his rights to counsel and to remain silent. Francois thereafter signed a Statement of Rights Form, which indicated he had been advised of his rights to counsel and to silence.

On October 6, 2005, the Grand Jury returned an indictment against the defendants. The original indictment was followed by a Superseding Indictment, and then a Second Superseding Indictment (the "Indictment").

The Indictment alleges that between November, 2004, and November, 2005, all of the defendants knowingly and intentionally conspired to possess with intent to distribute cocaine, crack cocaine, and marijuana.

The defendants now move to suppress all of the Title III wiretaps. The defendants contend that, from the outset, the wiretaps were not necessary to the agents' investigation, and were unsupported by probable cause. The defendants also claim that, the agents monitoring the wiretaps failed to properly minimize the interception of communications outside the scope of the authorization. Additionally, the defendants argue that, after the interceptions were completed, the government failed to provide them timely inventory notice of the authorization orders, applications, surveillance dates, and intercepted conversations.

Fagan seeks suppression of the crack cocaine uncovered after his vehicle was seized and searched by the DEA agents on June 8, 2005.

Fagan contends that the warrantless seizure and search of the vehicle were conducted in violation of his Fourth Amendment rights. Fagan also moves to suppress the drug ledgers and paraphernalia found after the search of his residence. Fagan argues that the warrantless search of his residence violated his Fourth Amendment rights because the alleged consent to search was improperly given.

Francois seeks to suppress all statements he made to the DEA agents after he was arrested on October 6, 2005. Francois argues that the agents violated his Fifth Amendment rights by subjecting him to custodial interrogation. He also contends that the agents violated his Sixth Amendment right to counsel by initiating contact with him for the purposes of deliberately eliciting information about the offenses with which he was charged. Furthermore, Francois claims that these Fifth and Sixth Amendment violations were not cured by the subsequent administration of *Miranda*[4] warnings.

## II. DISCUSSION

The exclusionary rule prohibits the introduction at trial of evidence obtained in violation of the Fourth, Fifth, or Sixth Amendments, for the purposes of proving a defendant's guilt. *See, e.g., Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2680, 165 L. Ed. 2d 557 (2006) ("[T]he Constitution requires the exclusion of evidence obtained by certain violations of the Fourth Amendment."); *United States v. Dickerson*, 530 U.S. 428, 433, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (explaining that a violation of a defendant's Fifth Amendment rights is a constitutional basis for the exclusion of statements obtained as a result); *Massiah v. United States*, 377 U.S. 201, 206-07, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) (excluding statements that were deliberately elicited from the defendant in violation of his Sixth Amendment right to counsel).

### A. Fourth Amendment Standard

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. CONST.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

amend. IV.[5] The first clause protects citizens from governmental intrusions where they have a reasonable expectation of privacy. There is a presumptive requirement that searches or seizures be carried out pursuant to a warrant. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (internal citations omitted)). Warrant-less searches or seizures must generally be based on probable cause in order to be considered reasonable. *See Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment ... .")

The Supreme Court has explained the distinction between searches and seizures:

> A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

*United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Moreover, the Supreme Court has stated that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County*, 506 U.S. 56, 68, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992).

## B. Fifth Amendment Standard

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The "inherently coercive" environment created by police custodial interrogation threatens the exercise of the Fifth Amendment privilege against self-incrimination. *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984).

---

[5] "The Fourth Amendment is made applicable to the Virgin Islands by the Revised Organic Act of 1954, § 3." *United States v. Charles*, 290 F. Supp. 2d 610, 614 (D.V.I. 1999).

■ When a defendant is subject to custodial interrogation by the police, procedural safeguards are necessary to preserve the defendant's Fifth Amendment privilege against compelled self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (holding that absent procedural safeguards, there is an irrebuttable presumption of coercion when a defendant is interrogated while in police custody). Accordingly, the police may not interrogate a defendant unless they have first adequately advised him of his rights. *Id.* If the police interrogate a defendant in custody without first giving sufficient warnings, the defendant's Fifth Amendment privilege against self-incrimination may be threatened. *Id.*

■ The Fifth Amendment also provides that, "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Admission of an involuntary statement or confession may violate a defendant's due process rights as well as his privilege against self-incrimination. *Mincey v. Arizona*, 437 U.S. 385, 399-401, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). A statement or confession may be involuntary despite the administration of *Miranda* warnings. *See Dickerson*, 530 U.S. at 444 ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness requirement.").

## C. Sixth Amendment Standard

■ The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. CONST. amend. VI. The Sixth Amendment right to counsel attaches at critical stages of criminal prosecution, after adversarial proceedings have been initiated against the defendant. *Brewer v. Williams*, 430 U.S. 387, 401, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) (explaining that the Sixth Amendment right to counsel attaches when adversarial proceedings have been initiated, for example, at arraignment). Once the Sixth Amendment right to counsel has attached, any incriminating statements that were "deliberately elicited" from the defendant by law enforcement in the absence of counsel or a valid waiver of counsel's presence may be inadmissible at trial. *Id.* at 399. Because the Sixth Amendment right to counsel is offense-specific, suppression is only required for statements deliberately elicited from a defendant about a crime for which he has been formally charged. *Cobb*, 532 U.S. 162, 168, 121 S. Ct. 1335, 149 L. Ed. 2d 321 ("[A] defendant's statements

regarding offenses for which he has not been charged are admissible notwithstanding the attachment of his Sixth Amendment right to counsel on his other charged offenses."). .

## D. The Statutory Exclusionary Rule of Title III

█ Title III contains a statutory exclusionary rule. *See* 18 U.S.C. § 2518(10)(a).[6] However, Congress did not intend to expand the scope of existing search and seizure law when it included an explicit statutory suppression remedy in Title III. *United States v. Giordano*, 416 U.S. 505, 527, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974). Indeed,

> [S]uppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

*United States v. Donovan*, 429 U.S. 413, 433-434, 97 S. Ct. 658, 50 L. Ed. 2d 652 (1977) (quoting *Giordano*, 416 U.S. at 527).

## III. ANALYSIS

The items sought to be suppressed in this matter include the Title III wiretaps, the physical evidence obtained from Fagan's vehicle and residence, and any statements made by Francois to law enforcement after his arrest. The admissibility of each item of proffered evidence is discussed separately below.

---

[6] Section 2518(10)(a) provides, in part:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

...

18 U.S.C. § 2518(10)(a).

## A. Title III Wiretaps

The defendants move to suppress all communications intercepted through the Title III wiretaps.

### 1. Standing

■ All of the defendants have joined in the motion to suppress the Title III wiretaps. As a threshold matter, each defendant's claim may proceed only if he has standing to contest the government action. Only a defendant whose Fourth Amendment rights have been violated by the surveillance has standing to challenge the admissibility of Title III wiretaps. *United States v. Alderman*, 394 U.S. 165, 171-76, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969). Accordingly, a defendant must have been either a party to the intercepted conversation or an owner of the premises where the illegal interception occurred in order to seek suppression of a Title III wiretap. *Id.* at 176-78 (holding that the owner of the premises where the illegal interception occurred had standing to assert a violation of Title III, even if the owner did not participate in any of the intercepted conversations).

Here, the Court is aware of intercepted conversations to which Mark, Dinzey, Fagan, Blyden, Francois, and Emmanuel were parties. Therefore, Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel all have standing to challenge the admissibility of the wiretaps. The Court is not aware of any intercepted communication to which Prince, Thompson, or Boodoo was a party, nor do these defendants assert any ownership interest in any of the locations where the illegal interception occurred. Accordingly, only Mark, Dinzey, Fagan, Blyden, Francois, and Emmanuel may challenge the admissibility of the communications intercepted through the Title III wiretaps.

### 2. Necessity of the Wiretap

As grounds for suppression, Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel contend that the wiretaps were unnecessary to the drug trafficking investigation. Specifically, they claim that the agents were able to obtain sufficient information through traditional means of investigation, such as ground surveillance and confidential informants. They also claim that the agents could have attempted to arrest certain

785

suspects at an early date and secure their cooperation before resulting to a wiretap investigation.

█ Title III provides that a wiretap order may only issue upon a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous." *See* 18 U.S.C. § 2518(3)(c). Each wiretap application must independently satisfy the necessity requirement. *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th Cir. 1988).

█ Law enforcement officers need not exhaust every conceivable investigative technique before resorting to electronic surveillance. *United States v. Williams*, 124 F.3d 411 (3d Cir. 1997). "Rather, it is sufficient if there is evidence that normal investigative techniques ... reasonably appear to be unlikely to succeed if tried." *Id.* (quotations omitted). Indeed, the government's affidavit in support of the wiretap, "need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992)) (quoting *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975)).

█ In determining whether the necessity requirement has been satisfied, it is proper to take into account affirmations founded in part upon the specialized training and experience of law enforcement officers. *Id.* Whether a wiretap is necessary to a given investigation "is to be 'tested in a practical and commonsense fashion.'" *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976)).

Here, each affidavit in support of each wiretap authorization or extension contained a statement that ground surveillance of the Savan area had been tried, but with little success. The physical layout of the streets and the terrain of Savan rendered visual surveillance difficult. Hired "look-outs" in the neighborhood allegedly alerted drug dealers when law enforcement vehicles are present. Though a confidential informant completed several controlled narcotics transactions with certain suspects, the informant was unable to infiltrate to higher levels of the suspected drug trafficking organization. Coconspirators allegedly used cellular phones to conduct their criminal business and prevent detection. Pen registers had been used, but did not reveal the contents of the conversations. Individuals with knowledge of the suspected criminal activity were themselves participants in the conspiracy. Such participants would therefore have been unlikely to provide truthful, significant

information, and may have alerted other participants of the investigation. Grand jury investigations or search warrants may have also jeopardized the investigation by alerting targets. Moreover, such techniques would not likely reveal the full scope of the conspiracy to identify all the conspirators.

In addition to the above, the affidavit supporting the Fagan wiretap asserted the following. Though the Dinzey wiretap was able to identify some alleged sources of supply, it would not reveal participants of the conspiracy on a higher-level since Dinzey was a suspected mid-level drug dealer. On May 2, 2005, Fagan allegedly believed there was a police presence near Dinzey's home and changed the location for a drug transaction accordingly. On at least five occasions, the surveillance teams ceased all operations because they believed they had been detected by drug dealers in Savan.

Finally, the affidavit in support of the Mark wiretap adds the following claims of necessity. Mark and his associates regularly conducted counter-surveillance on law enforcement before attempting illegal activity. Mark's residence was allegedly surrounded by a security gate which agents believed to be fortified with motion lights and cameras. Though the Fagan wiretap had allowed agents to identify Mark, it would not lead to higher members of the alleged conspiracy because Fagan was believed to be a mid-level drug dealer. Therefore, Agent Goldfinger asserted that the agents needed to wiretap Mark's phone in order to determine the scope, nature, and methods of his drug business.

██ Each affidavit, standing alone, provided a sufficient factual predicate for finding that normal investigative techniques were unlikely to succeed at that stage in the investigation. Indeed, the affidavits explained that ground surveillance and confidential informants could provide only limited information. They also suggested that arresting suspects in an attempt to gain their cooperation would have jeopardized the investigation by alerting other coconspirators. Moreover, the agents were not required to exhaust every possible method of investigation, including attempts to arrest and "flip" coconspirators, before applying for a wiretap.

Accordingly, the wiretaps in this case satisfied the necessity requirement of Title III. *See, e.g. Williams*, 124 F.3d at 418 (finding that the government had shown necessity for video surveillance where agents were unable to use confidential informants without a high risk of

discovery, aural surveillance could not perceive silent criminal activity, and coconspirators used evasive techniques to avoid detection); *United States v. Guerra-Marez*, 928 F.2d 665, 670 (5th Cir. 1991) (finding necessity satisfied even though officers had not fully exploited controlled purchases, confidential informants, and other traditional surveillance because the untried methods were not reasonably likely to succeed).

### 3. Probable Cause

Defendants Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel also claim the wiretaps were unsupported by probable cause. They argue that the government failed to provide any scientific, experimental, or empirical basis for their interpretations of the intercepted conversations. Additionally, Mark argues that the Dinzey wiretap order named him as a "target subject" but failed to specify the nature of his involvement or the information the agents possessed regarding him at the time.

 Title III requires a showing of probable cause in three different contexts: (1) that an individual has or is about to commit one of several enumerated offenses; (2) that particular communications relating to the charged offense will be obtained through the interception; and (3) that the facilities from which the communications are to be intercepted are being used in connection with the charged offense. *Armocida*, 515 F.2d at 35. The probable cause required for wiretaps focuses on the "target facility," or cellular phone number believed to be used to facilitate criminal activity. *Id.* at 1117. Wiretaps are not directed at people. *Id.* at 1118. Accordingly, an affidavit supporting a wiretap order need not provide information sufficient to justify the arrest of the individual in possession of or in control of the property. *Id.*

 The standard for determining whether probable cause exists under Title III is the same as that used to obtain ordinary search warrants. *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983). The probable cause determination thus depends on the totality of the circumstances:

> The task ... is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). In determining whether probable cause has been shown, it is

appropriate to consider reasonable inferences made by law enforcement officers based on their specialized training and experience. *United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).

Here, the affidavit in support of the Dinzey wiretap indicated that DEA agents had received tips from confidential sources that Dinzey, Prince, and Thompson were engaged in drug trafficking activities. It detailed how a confidential informant had successfully completed several controlled purchases of narcotics from Dinzey, Prince, and Thompson. It also described several consensual conversations recorded by the agents in which drug transactions were arranged, which the confidential informant later carried out. Moreover, it explains that the confidential informant obtained Dinzey's cellular phone number during one of the controlled transactions. Analysis of pen registers, trap and trace devices, and toll records showed numerous calls between Dinzey's phone number and phone numbers subscribed to other suspected drug dealers.

Based on the totality of the circumstances, there was probable cause to believe that Dinzey, Prince, and Thompson, amongst others, had committed and would continue to commit a drug trafficking offense. These facts also establish probable cause to believe that communications relating to the alleged drug trafficking would be obtained through interception of wire communications, and that Dinzey's phone number was being used to facilitate the criminal conduct. The government was not required to show probable cause that Mark, individually, was involved in the drug trafficking conspiracy. *See Tehfe*, 722 F.2d at 1117-18.

The affidavits supporting the Dinzey extension and the Fagan and Mark wiretaps contained most of the same facts as the Dinzey affidavit, and also included evidence from intercepted conversations, which the agents interpreted as relating to drug transactions.

The Court acknowledges that the intercepted conversations could be subject to differing interpretations. However, when viewed in the totality of circumstances, including the reasonable inferences made by the officers and the patterns of similar conversations, the affidavits support a finding of probable cause with respect to the Dinzey extension, the Fagan wiretap, and the Mark wiretap. *See, e.g., United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (acknowledging that an intercepted conversation could be interpreted in various ways, but finding

nonetheless that the totality of circumstances supported a finding of probable cause for the wiretap).

### 4. Minimization

Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel allege that the agent failed to carry out the surveillance in accordance with the order by failing to minimize the scope of the surveillance according to the Court's authorization.

 After law enforcement officers receive court authorization for a wiretap, Title III imposes a continuing duty to minimize the interception of communications that are not relevant to the criminal investigation. *See* 18 U.S.C. § 2518(5). Title III provides:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception ... .

*Id.* The minimization effort must be objectively reasonable in light of the totality of the circumstances. *See Scott v. United States*, 436 U.S. 128, 136-37, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978).

Here, each wiretap order contained the requisite provision mandating that "all monitoring of wire communications be limited to those communications relevant to the pending investigation." At the suppression hearing, Agent Mark Thomas described the manner in which the agents limited the interception of irrelevant conversations:

> A: [W]e w[ould] listen to the call for about a minute, as [a call] beg[an], we w[ould] listen to the call for about a minute. If it ha[d] nothing to do with the investigation, as far as being any drug activity or any criminal activity, we would turn the monitor off, and then go back to it in 15 to 20 seconds, 20 to 30 seconds, in that kind of time frame, to see if there was] any pertinent information. If not, then we would minimize it again, or turn the monitor off.

(Suppression Hr'g Tr. 250, Jan. 4, 2007.)

 The alleged conspiracy was complex, involving many suspected participants. Additionally, the defendants spoke in local dialect during the conversations that were allegedly related to drug trafficking. In light of the totality of the circumstances, the Court finds that the agents'

790

minimization efforts were reasonable. There is no evidence in the record before the Court that the government did anything contrary to the Court's wiretap orders or contrary to the minimization instructions.

### 5. Inventory Notice

■ Finally, Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel assert that the government failed to provide them timely notice of the wiretap inventory after the surveillance was terminated.[7] Failure to provide timely inventory notice does not require suppression unless such failure has caused incurable prejudice to the defendant. *Donovan*, 429 U.S. at 438-39. Mark, Dinzey, Fagan, Blyden, Francois and Emmanuel have not shown incurable prejudice as a result of the postponement of service of inventory notice. *See id.* (holding that suppression was not required due to the government's inadvertant failure to provide inventory notice where the defendant was not prejudiced because the notice was provided in discovery). Therefore, any delay in the inventory notice provided no support for suppression.

Accordingly, the Court will deny the motions of all of the defendants to the extent they seek suppression of the communications intercepted through the Title III investigation. The Court will not suppress the communications intercepted through the Dinzey, Fagan, or Mark wiretaps.

### B. Search of Fagan's Car

Fagan seeks suppression of the crack cocaine recovered from his Mazda on June 8, 2005. Fagan argues that the agents illegally searched the Mazda without a warrant.

■ Though a search or seizure conducted without a warrant is presumptively invalid, in some instances a warrantless search or seizure may be considered reasonable if based upon probable cause. *See Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("[S]ufficient probability ... is the touchstone of reasonableness under the Fourth Amendment ... ."). Under the automobile exception to the warrant requirement, once the police have lawfully stopped a vehicle, they may

---

[7] Title III provides that an inventory notice of the application, order, and any intercepted communications must be served upon each person named in the order within a reasonable time, not to exceed ninety days after the termination of the wiretap. *See* 18 U.S.C. § 2518(8)(d).

search the vehicle and any containers therein without a warrant as long as they have probable cause that it contains contraband. *California v. Acevedo*, 500 U.S. 565, 579, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991). The exigencies caused by the ready mobility of automobiles, together with the reduced expectation of privacy in vehicles (as opposed to, for example, houses) justify immediate searches of automobiles. *California v. Carney*, 471 U.S. 386, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985); *Carroll v. United States*, 267 U.S. 132, 151, 45 S. Ct. 280, 69 L. Ed. 543, T.D. 3686 (1925); *United States v. Burton*, 288 F.3d 91, 100-01 (3d Cir. 2002).

██ Probable cause exists where the totality of the circumstances known to the agents at the time of the search or seizure supported a fair probability that contraband or evidence of a crime will be found. *See Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). Evidentiary factors relevant to the probable cause determination include: the cumulative weight of the information set forth by the investigating officers, the reasonable inferences made by the officers based on their specialized training and experience, and the "veracity" and "basis of knowledge" of persons supplying hearsay information. *See Gates*, 462 U.S. at 268 (explaining that the totality of the circumstances includes the veracity and basis of knowledge of informants' tips); *United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (discussing the cumulative weight of the information in connection with the officer's reasonable inferences). Whether probable cause exists is an objective inquiry. *See Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

At the suppression hearing, the Court asked Agent Goldfinger, "[w]hat is the ... specific articulable information that was used for law enforcement to conclude that the vehicle was being used for narcotics?" Agent Goldfinger responded:

> On that specific day, Mr. Mark had requested, again, that Mr. Fagan check on the Marine Enforcement vessel, to see if it was under patrol, out in the waters off of St. Thomas.

Mr. Mark had also made contact with the person known by investigators as Walter Ells, the boat handler, to advise him that he would be giving him a call when things were ready.

Mr. Mark then advised Mr. Fagan to then go to the dock ... .

(Suppression Hr'g Tr. 107, Jan. 4, 2007.)

The government places great weight on the agents' conclusions that a drug transaction had occurred at Coki Beach on the night of June 8, 2005. The agents intercepted calls between Mark and Fagan on two prior occasions, which they interpreted as referring to whether or not the Marine Patrol boat was docked. They had also observed Fagan travel to the Redhook Harbor and to the Coki Beach area on June 7, 2005, after one of these conversations. Additionally, a confidential informant had seen a boat pull up to the Coral World Dock on June 20, 2004, and unload several duffel bags into a vehicle. However, the agents only saw Fagan's car drive to and from the road to Coki Beach. They never observed any boat, any transaction, or any suspicious item inside the Mazda. Nor did the informant, no matter how reliable, ever actually observe anything elicit at the Coral World Dock. The tip was also a year old, and the alleged drop-off in 2004 involved neither Mark nor Fagan.

While the Court acknowledges that Fagan's evasion of the agents may have been suggestive of wrongdoing on his part, the facts indicate that Fagan was speeding away from Coki Beach before the agents began to follow him. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (noting that headlong flight does not necessarily indicate wrongdoing, but may be suggestive of such).

Moreover, though the agents suspected Fagan was involved in drug trafficking activity, they did not have any evidence that would lead to more than a mere suspicion that Fagan stored contraband in the Mazda. This is especially true given that approximately an hour and a half had passed before the agents found the Mazda, and they knew that Fagan was not in or near the vehicle at the time. *See United States v. Haynes*, 301 F.3d 669, 678-79 (6th Cir. 2002) (explaining that, despite the officers' suspicion that the defendant had committed burglary, they had no evidence that the stolen items were stored in his car, parked outside the apartment where he was arrested); *United States v. Edwards*, 242 F.3d 928 (10th Cir. 2001) (finding that, though the officers suspected the defendants had robbed a bank and arrested them with $2000 in cash

793

stained with red dye, there was no evidence supporting a fair probability that their parked car contained contraband or further evidence of a crime).

The totality of the facts and circumstances known to the agents at the time did not support a fair probability that the Mazda contained contraband or evidence of a crime. *Cf. United States v. Virden*, 417 F. Supp. 2d 1360, 1369 (M.D. Ga. 2006) (finding no probable cause to believe a vehicle contained contraband after the driver was arrested for obstructing justice by lying about the address he had left prior to being stopped, when the true address was being investigated as a site of drug activities). Thus, there was no probable cause to search or seize the Mazda on June 8, 2007. Accordingly, the Court will grant Fagan's motion. The crack cocaine uncovered from the Mazda will be suppressed.

## C. The Search of Fagan's Residence

The agents searched Fagan's residence after receiving written consent from an individual who they believed to be the owner of the premises. The search uncovered drug legers and paraphernalia. Fagan argues that the search was illegal because the consent was improperly given.

It is well-settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Consent to a search is valid if: (1) it was given voluntarily, and (2) the consenting party had authority or apparent authority to consent. *Id.* at 228-29. The government bears the burden of proving voluntariness and authority by a preponderance of the evidence. *United States v Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

### 1. Voluntariness

Consent is voluntary if the totality of the circumstances reveal that it was given under conditions free from explicit or implicit police coercion. *Id.* at 228-29 (distinguishing consent to search from waiver of a trial right because the defendant's "knowledge of a right to refuse to consent to a search is not a prerequisite of a 'voluntary' consent"). Here, the government has presented evidence that the individual who gave consent to search Fagan's residence signed a consent to search form. There is no indication or allegation that the consent was obtained through

any explicit or implicit coercion by the agents. Accordingly, the Court finds that the consent was voluntary.

## 2. Authority

Consent may be obtained from the individual whose property is searched or from a third party with actual or apparent[8] common authority over the property. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). "'Common authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes ... .'" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)).

Here, the government has presented evidence that the owner of the premises consented to the search of Fagan's residence. Moreover, there is no evidence in the record suggesting that the consenting party was not in fact the property owner, or lacked common access and control of Fagan's room for most purposes. *See, e.g., United States v. Hinkle*, 456 F.3d 836, 840 (8th Cir. 2006) (holding that a property owner had both actual and apparent authority to consent to the search of a trailer located on the premises). Therefore, the consent was valid, and the search was reasonable under the Fourth Amendment. Accordingly, the Court will deny Fagan's motion to suppress the drug ledgers and paraphernalia found in Fagan's room.

## D. Francois' Statements

Francois seeks to suppress the statements he made to the agents after he was arrested on October 6, 2005. The alleged incriminating statements included Francois' explanation of how he met Dinzey and Francois' admission he had sold Dinzey $50 worth of marijuana on several occasions. Francois claims that the statements were obtained in violation of both his Fifth Amendment privilege against self-incrimination and right to due process. Francois also contends that the statements should be

---

[8] Apparent authority exists when the consenting party is not actually authorized to consent, but officers reasonably believe the individual has common authority over the property. *Rodriguez*, 497 U.S. at 186. The reasonableness of apparent authority is an objective inquiry: "would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* at 188.

suppressed because the agents violated his Sixth Amendment right to counsel before they obtained the statements.

## 1. The Fifth Amendment Privilege Against Self-Incrimination and Right to Due Process

Francois argues that his statements were obtained in violation of his *Miranda* rights.

Statements obtained during the custodial interrogation of a defendant who has not been read his *Miranda* rights are inadmissible at trial. *See Miranda*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Two elements must be present before a defendant's pre-*Miranda* statement's will be suppressed. First, the defendant must have been in police custody at the time the statements were made. *See, e.g., Yarborough v. Alvarado*, 541 U.S. 652, 662-63, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (holding that custody for *Miranda* purposes is determined by examining the totality of the circumstances surrounding interrogation and determining whether a reasonable person would have felt free to terminate the interrogation and leave). A defendant who is under arrest is clearly in custody. *See Orozco v. Texas*, 394 U.S. 324, 329, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) ("Once arrest occurs, the application of *Miranda* is automatic."). Second, the police must have interrogated the defendant, which includes not only direct questioning, but any words or actions that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Confronting a defendant with tapes of incriminating statements constitutes interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 487, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (finding that police interrogated the defendant when they confronted him with tapes of alleged accomplices making incriminating statements against him).

Here, Francois was under arrest at the time he made the statements in question. Therefore, he was clearly in police custody when the statements were made. Furthermore, after Francois was arrested but before he was given *Miranda* warnings, the agents played him a tape of his allegedly incriminating conversations intercepted through the wiretap. Accordingly, Francois was subjected to custodial interrogation before he was advised of his rights under *Miranda*. *See Orozco*, 394 U.S.

at 329; Edwards, 451 U.S. at 487. However, Francois did not make any statements to the agents before he was read his rights.

Francois acknowledges that he was advised of his rights to silence and counsel, but argues that his waiver of these rights was invalid because it was the involuntary result of psychological coercion by Agent Joseph. Francois claims that Agent Joseph coerced him by establishing a position of family trust. Francois also claims that the conduct of the agents in playing him the tape of the intercepted conversations amounted to mental coercion.

■■ A defendant who has been advised of his *Miranda* rights may waive them, as long as such waiver is knowing, intelligent, and voluntary, given the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 422-23, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (validating the defendant's waiver of his *Miranda* rights because such waiver was uncoerced, the defendant knew he could remain silent and request a lawyer, and he was aware of the government's intention to use his statements against him). "The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver ... ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (citation omitted).

■■ "The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion). Either physical or psychological coercion by law enforcement may render a *Miranda* waiver involuntary. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). Whether a statement was obtained through psychological coercion must be determined in light of the totality of the circumstances, including factors such as:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; [and] the repeated and prolonged nature of questioning ... .

*Id.* Even if psychological coercion is found, suppression is not required unless there is a causal connection between the misconduct and the statement. *Connelly*, 479 U.S. at 165.

797

At the suppression hearing, the prosecutor discussed Francois' waiver with Agent Joseph:

Q: After reading [Francois] his rights, what, if anything, occurred?

A: He signed a waiver. He was, he agreed to cooperate and make a statement. He was very cooperative. As a matter of fact, of all the defendants, he [wa]s the only one that cooperated.

(Suppression Hr'g Tr. 83, Jan. 5, 2007.) That evidence indicates a knowing, voluntary, and intelligent waiver by a competent person.

 Francois has not alleged that the *Miranda* warnings themselves were defective, or that his waiver was not sufficiently knowing or intelligent. Moreover, there is no evidence to suggest that Francois was too young or uneducated to voluntarily waive his rights to silence and counsel. Francois had only been detained for an hour and a half before he was given *Miranda* warnings. There is no evidence that Francois was subjected to repeated or prolonged questioning at the time he waived his rights. Given the totality of the circumstances, Agent Joseph's act of notifying Francois of their family relationship and the agents' conduct in playing the tapes of the wiretap did not amount to psychological coercion. *See, e.g., Miller,* 796 F.2d at 611-12 (holding that a defendant's confession was voluntary, despite police interrogation tactics aimed at winning the defendant's trust and making him feel more comfortable about confession); *United States v. Lux,* 905 F.2d 1379, 1382 (10th Cir. 1990) (finding the defendant's statements voluntary, notwithstanding the fact that the detective lied to the defendant about her codefendant's statement, leaned over and hit his fist on the table, and accused the defendant of lying). Accordingly, Francois knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Finally, Francois claims that his statements were involuntary even if *Miranda* waiver was voluntary. A statement may be the product of police overreaching even after a defendant has been advised of and validly waived his *Miranda* rights. *See Dickerson,* 530 U.S. at 444 (acknowledging that the administration of *Miranda* warnings does not dispense with the requirement that a statement be made voluntarily). However, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are

rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

 Moreover, the only additional evidence Francois offers to support his assertion that he was subjected to psychological coercion after he waived his *Miranda* rights is that Agent Joseph told him that it would be beneficial to him if he cooperated. Promises by law enforcement that the defendant will receive leniency in exchange for cooperation may be so attractive as to be coercive to a defendant. Nonetheless, "government agents may validly make some representation to a defendant or may discuss cooperation without rendering the resulting confession involuntary." *Miller*, 796 F.2d at 608. When considered in light of the totality of the circumstances surrounding Francois' confession, Agent Joseph's statement that it would be beneficial to Francois if he cooperated did not constitute psychological coercion. The Court finds that the statements Francois made to the agents after he was arrested on October 3, 2005, were made voluntarily after a valid *Miranda* waiver.

## 2. Right to Counsel

Francois also claims that his statements should be suppressed because the agents violated his Sixth Amendment right to counsel by questioning him about the conspiracy after he was arrested on October 6, 2005, without an attorney present.[9]

 A defendant may waive his Sixth Amendment right to counsel provided he does so knowingly, intelligently, and voluntarily. *Id.* at 404. The administration of *Miranda* warnings is sufficient to apprise a defendant of the nature of his Sixth Amendment right to counsel and the consequences of abandoning this right, so that his waiver may be considered knowing and intelligent. *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988). The Court has already found

---

[9] Francois' Sixth Amendment right to counsel had attached by the time he was arrested on October 6, 2005, since the government had filed a criminal complaint against him on September 30, 2005. *See Kirby v. Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972) (noting that the Sixth Amendment right to counsel may attach when judicial proceedings have been commenced against a defendant by way of formal charge). Additionally, the agents may have deliberately elicited incriminating testimony from Francois about the crimes for which he had been charged by playing the tape of his intercepted conversations. *See Brewer*, 430 U.S. at 399 ("That the incriminating statements were elicited surreptitiously ... is constitutionally irrelevant.").

that Francois was advised of his *Miranda* rights and voluntarily waived them before he made any statements to the agents. Therefore, Francois validly waived his Sixth Amendment right to counsel.

Because Francois made all of his statements to the agents voluntarily, after a valid waiver of both his Fifth and Sixth Amendment rights, the Court will deny Francois' motion to the extent it relates to these statements. The statements made by Francois to the agents after he was arrested on October 6, 2005, will not be suppressed.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny the defendants' motion to suppress the communications intercepted through the Title III wiretap. With respect to Fagan, the Court will grant the motion to suppress as it relates to the crack cocaine uncovered from his Mazda, but deny the motion as it relates to the drug ledgers and paraphernalia found in his room. Finally, the Court will deny the motion to suppress the statements Francois made to the agents after he was arrested. An appropriate judgment follows.