NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2642

_____

UNITED STATES OF AMERICA

v.

MICHAEL L. KARRER,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-08-cr-00236-001)
District Judge:  Honorable D. Michael Fisher[*]

_____

Submitted Under Third Circuit LAR 34.1(a)
January 27, 2012

Before:  AMBRO, CHAGARES and HARDIMAN, *Circuit Judges*.

(Filed: February 1, 2012)

_____

OPINION OF THE COURT

_____

_____

[*]The Honorable D. Michael Fisher, Judge of the United States Court of Appeals
for the Third Circuit, sitting by designation.

HARDIMAN, *Circuit Judge*.

Michael Karrer appeals his judgment of conviction for possession of child pornography under 18 U.S.C. § 2252(a)(4)(B) after the District Court refused to suppress evidence found pursuant to a search warrant he claims was general, overbroad, and lacking in probable cause. We will affirm.

I

Because we write solely for the parties, who are well acquainted with the case, we recount only the essential facts and procedural history.

Pennsylvania State Trooper Glenn Bard began investigating Karrer after monitors at Neopets, a children's website with virtual pets and online chat functionality, noticed "inappropriate communication" from a 37-year-old male registered user.[1] Working with a Neopets security consultant, Bard discovered that Karrer's various Neopets accounts originated from one computer and that Karrer had a MySpace page. Upon viewing Karrer's MySpace profile photograph, Bard recognized him from a 2003 investigation for unlawful contact with a minor. Using Karrer's internet protocol (IP) address and the

---

[1] Karrer asked one thirteen-year-old girl, "would it bother you if i said that i was trying to hit on you? . . . just curious as to if i asked you to be my gf, would you accept?" In another chat with a fourteen-year-old girl, Karrer represented himself as a teenager and wrote "i am 15 female from new jerse[y], united states. my family and i are in a n-u-d-i-s-t camp and love it. what about you?" Karrer also asked questions regarding what types of underwear the girls wore and whether he could send them flowers.

Pennsylvania driver's license database, Bard determined that Karrer lived at the

Pittsburgh address from which the Neopets communications originated.

On May 13, 2008, Bard applied for a warrant to search Karrer's residence for

evidence of unlawful contact with a minor in violation of 18 Pa. Cons. Stat. § 6318.[2]  In

his application, Bard requested authorization to search and seize

---

[2] Under § 6318,

(a) . . . A person commits an offense if he is intentionally in contact with a minor, or a law enforcement officer acting in the performance of his duties who has assumed the identity of a minor, for the purpose of engaging in activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:

(1)  Any of the offenses enumerated in Chapter 31. [By way of example, Chapter 31 enumerates ten offenses, including rape, sexual assault, and indecent exposure. *See* 18 Pa. Cons. Stat. §§ 3121–3130.].
(2)  Open lewdness as defined in section 5901.
(3)  Prostitution as defined in section 5902.
(4)  Obscene and other sexual materials and performances as defined in section 5903.
(5)  Sexual abuse of children as defined in section 6312.
(6)  Sexual exploitation of children as defined in section 6320.

Contact with a minor is defined as

[d]irect or indirect contact or communication by *any means, method or device*, including contact or communication in person or through an agent or agency, through any print medium, the mails, a common carrier or communication common carrier, any electronic communication system and any telecommunication, wire, computer or radio communications device or system.

3

[a]ll computer internal and peripheral storage devices, (such as fixed disks, external hard disks, floppy disk drives, and diskettes, tape drives, tapes, and optical storage devices), peripheral input / output devices (such as keyboards, printers, hardware, including, but not limited to, any equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical or similar computer impulses or data . . . [and] [a]ny computer processing units, scanners, plotters, video display monitors, and optical readers), and related communication devices such as modems, cables, and connections, recording equipment, as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware.

In addition to the broad array of computer-related items, Bard sought authorization to search for and seize "[a]ny cellular phones, smart phones, (IE blackberry, iPhone, and so on) and personal data assistants which can be used for the purpose of accessing the internet, chat programs, or e-mail applications." Bard attached a seven-page affidavit detailing his experience in computer forensics and his investigation of Karrer's Neopets communications. He explained that in light of the numerous ways in which evidence on computers can be masked, hidden, or deleted, "it is very often necessary to take all computer hardware and software found at the suspected location." Bard also expressed the intent to transport the computer-related items from Karrer's residence to an off-site location for a thorough forensic search.

The Magistrate Judge issued a warrant granting Bard permission to search for and seize all computer-related items and cell phones listed in his affidavit. The warrant listed the "date(s) of violation" as November 2007 through May 2008 and expressly

---

18 Pa. Cons. Stat. § 6318(c) (emphasis added).

incorporated the affidavit by reference. It also erroneously indicated that the seized items would be "searched for evidence relating to the possession and/or distribution of child pornography."

Later that day, Bard and Trooper Scott Lucas executed the warrant at Karrer's address. In Karrer's bedroom, Lucas identified a computer and a Motorola KLM cellular phone. According to Lucas, he searched the phone because it was capable of transmitting "text-type communications" and e-mails and accessing the Internet. Lucas decided to view the phone's photos folder because cell phones often store remnants of Internet-based communications as image files in that type of folder. When Lucas accessed the photos folder, he immediately saw what he believed to be a male hand touching a young girl's genitals. Lucas showed the photo to Bard and stopped searching the cell phone. Lucas also seized Karrer's computer but did not search it at Karrer's residence.

Bard and Pennsylvania State Police Supervisor Corporal Robert Erderly approached Karrer to discuss the image found on his cell phone. They told Karrer they wished to record a conversation with him but that he was under no obligation to speak with them and could stop the discussion at any time. They also read Karrer the *Miranda* warnings. During the conversation, Karrer admitted that he had taken three photographs of his four-year-old niece, that he had touched her genitals, and that he had chatted with minor girls on the Internet. He further confessed that his computer and a separate CD

5

contained sexually explicit photographs of a girl he met on MySpace. Karrer then gave the officers his signed consent to view the CD images. Based on the information they had gathered, the officers obtained a second search warrant for child pornography[3] and notified local police of Karrer's potential offenses against his four-year-old niece.

Upon searching Karrer's computer, cell phone, and CD, police located sexually explicit conversations with minors and photographs of minors "in various states of undress," which were eventually used to indict him on three criminal counts. Count One charged Karrer with violating 18 U.S.C. § 2251(a), which criminalizes sexual exploitation of a minor "for the purpose of producing [a] visual depiction of such conduct." Counts Two and Three alleged receipt and possession of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (4)(B), respectively. After Karrer's motion to suppress was denied by the District Court, he entered a conditional guilty plea to Count Three, reserving his right to challenge "whether the search warrant was invalid because it was not supported by probable cause, because it violated the particularity requirement, or because it was overly broad." Thereafter, Karrer was sentenced to 120 months' imprisonment and a life term of supervised release pursuant to his plea agreement. He timely appealed.

---

[3] Karrer's arguments concern only the first warrant for evidence of unlawful communications with a minor, not this second warrant for child pornography. Thus, our references herein to "the warrant" concern the first warrant.

II

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.  When reviewing a district court's suppression ruling, we review its factual findings for clear error and exercise plenary review over its legal conclusions.  *E.g.*, *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010).  In reviewing a magistrate's finding of probable cause, we inquire only whether there was a "substantial basis" to conclude that the affidavit established probable cause, and we are necessarily deferential.  *E.g.*, *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005).

A

Karrer first argues that his motion to suppress should have been granted because the warrant was an illegal general warrant.  We disagree.

It is axiomatic that a "warrant[] must 'particularly describ[e] the place to be searched and the persons or things to be seized,'" *United States v. Yusuf*, 461 F.3d 374, 393 (3d Cir. 2006) (second alteration in original) (quoting U.S. Const. amend. IV), and that when it does not, "all evidence seized pursuant to [the] general warrant must be suppressed," *United States v. Christine*, 687 F.2d 749, 758 (3d Cir. 1982).  A warrant is not unconstitutionally general "unless it can be said to 'vest the executing officer with unbridled discretion to conduct an exploratory rummaging . . . in search of criminal evidence.'" *United States v. Leveto*, 540 F.3d 200, 211 (3d Cir. 2008) (quoting *Christine*,

7

687 F.2d at 753).

Karrer argues that the warrant failed to impose meaningful limits on what and where the officers could search. In fact, the warrant identified particular devices and file types to be searched for evidence of a specific statutory offense. *See Yusuf*, 641 F.3d at 395. It also sufficiently identified a time period during which the suspected offenses occurred. *See id.* And the warrant's authorization to search and seize virtually all computer-related items in Karrer's home does not invalidate the warrant. *See, e.g.*, *United States v. Stabile*, 633 F.3d 219, 234 (3d Cir. 2011); *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149–50 (3d Cir. 2002) (upholding a similar warrant as "indubitably broad," but not unconstitutionally general). Nor does the language in the incorporated affidavit authorizing officers to search for "such evidence of a criminal offense" render the warrant general. A warrant must be read as a whole, *see, e.g.*, *Tracey*, 597 F.3d at 154, and a supporting affidavit likewise "is to be read in its entirety and in a common sense, nontechnical manner," *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011); *see also United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982) ("When a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant."). Accordingly, "such evidence of a criminal offense" refers not to *any* criminal offense, but to the criminal offense of unlawful contact

8

with a minor defined throughout the remainder of the warrant and affidavit. *See*

*Andresen v. Maryland*, 427 U.S. 463, 480–81 (1976) (holding that the phrase "together

with other fruits, instrumentalities and evidence of crime at this (time) unknown" did not

render a warrant general where context made clear that the reference was to false

pretenses crime).

Karrer contends that the warrant failed to particularly describe the offenses for

which evidence could be searched. He argues that the warrant's reference to § 6318 of

the Pennsylvania Crimes Code was inadequate to limit the warrant's scope because that

statute is extraordinarily broad, defining what he calculates to be fifty-two possible

communications offenses. Indeed, the Supreme Court has held that reference to a very

broad statutory offense may not cure an otherwise general warrant. *See Stanford v. Texas*,

379 U.S. 476 (1965); *Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kan. City,*

*Mo.*, 367 U.S. 717 (1961). But the statutes in those cases are easily distinguished from

§ 6318. In *Stanford*, the Texas statute was a "sweeping and many-faceted law, which,

among other things, outlaw[ed] the Communist Party" and "authoriz[ed] the issuance of a

warrant 'for the purpose of searching for and seizing any books, records, pamphlets,

cards, receipts, lists, memoranda, pictures, recordings, or any written instruments showing

that a person or organization [was] violating or ha[d] violated any provision of [the]

Act.'" 379 U.S. at 477 (citation omitted). Moreover, the *Stanford* Court based its

9

invalidation of the warrant substantially on the statute's criminalization of "literary material." *Id.* at 486. In *Marcus,* the Missouri statute criminalized similarly ill-defined, speech-related materials, including "obscene, lewd, licentious, indecent or lascivious [items] . . . or other articles or publications of an indecent, immoral or scandalous character." 367 U.S. at 719 n.2, 731–32. Unlike the statutes in *Stanford* and *Marcus*, § 6318 does not invite the value judgments of officers. Although it is broad in scope and prohibits communicating with minors on an array of topics, it specifically defines those topics. Accordingly, we hold that the officers' discretion was sufficiently limited.

B

Karrer next argues that the warrant was overbroad. An overly broad warrant "'describe[s] in both specific and inclusive generic terms what is to be seized,' but . . . authorizes the seizure of items as to which there is no probable cause." *Ninety-Two Thousand*, 307 F.3d at 149 (quoting *Christine*, 687 F.3d at 753–54). Probable cause exists where the totality of the circumstances suggests "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

We find no lack of probable cause to search and seize Karrer's computer-related and cell phone technologies for evidence of unlawful communications with minors. Bard's affidavit presented the magistrate with a substantial basis to believe such evidence

10

existed in Karrer's home, where the computer used to interact with teens on the Neopets website was located. Nor was the warrant overbroad simply because the devices and files it authorized to be searched and seized were likely to include materials unrelated to any § 6318 offense. "[A]s a practical matter, when a search requires review of a large collection of items, . . . 'it is certain that some innocuous [items] will be examined, at least cursorily, in order to determine whether they are, in fact, among those [items] authorized to be seized.'" *Stabile*, 633 F.3d at 234 (quoting *Andresen*, 427 U.S. at 482 n.11) (citation and internal quotation marks omitted). As Bard explained in his affidavit, given the nature of computer files and the tendency of criminal offenders to mislabel, hide, and attempt to delete evidence of their crimes, it would be impossible to identify *ex ante* the precise files, file types, programs and devices that would house the suspected evidence. *See id.* at 237 ("[I]t is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of the hard drive may be required."); *see also Yusuf*, 461 F.3d at 395 ("[T]he breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate."); *Christine*, 687 F.2d at 760 ("[T]he use of generic classifications in a warrant is acceptable when a more precise description is not feasible."). Moreover, as the Supreme Court has explained, "[t]echnical requirements of

11

elaborate specificity . . . have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Finally, there is no merit in Karrer's argument that the warrant was overbroad for failing to specify a protocol for browsing Karrer's computer files. Although we held in *Stabile* that such a protocol was sufficient to demonstrate a valid computer search in that case, 633 F.3d at 239–40, and that search methods must be "'tailored to meet allowed ends,'" *id.* at 239 (quoting *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009)), we also held that "the search warrant itself need not 'contain a particularized computer search strategy,'" *id.* at 238 (quoting *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005)).

C

Finally, we consider the warrant's authorization to search for and seize evidence of child pornography. It is undisputed that at the time the warrant was issued there was no probable cause to believe that evidence of child pornography offenses would be found on Karrer's technological devices. At the suppression hearing in the District Court, Bard testified that the reference to child pornography was template language that he inadvertently failed to delete. Crediting Bard's explanation and looking to the context of the entire affidavit, the District Court agreed that the reference to child pornography was simply "misplaced." We are skeptical that an erroneous reference to a wholly separate

12

crime, effectively authorizing a search for which no probable cause exists, can be analogized to harmless ministerial errors, *see, e.g.*, *Johnson*, 690 F.2d at 65 n.3 (attaching "no significance" to a typographical error in which the word "Section" in the statutory designation was mistakenly substituted with the word "Chapter"), or mistakes of fact not discoverable until the execution of the warrant, *see, e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 85–86, 87 & n.11 (1987) (upholding a warrant that failed to specify which of two apartments on a single floor was to be searched where the police believed there was only one apartment on that floor and explaining the "need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants"). But we need not resolve whether the child pornography reference was a forgivable ministerial error. Even redacting the unsupported child pornography reference from the warrant,[4] the images Lucas discovered on Karrer's cell phone fall within the "plain view" exception to the exclusionary rule.

Under the "plain view" exception, evidence obtained in violation of the Fourth Amendment need not be suppressed so long as three requirements are met. "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which

---

[4] "[A]n overly broad warrant can be redacted to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment." *Yusuf*, 461 F.3d at 393 n.19. "[T]he court need not suppress materials seized pursuant to the valid portions of the warrant,"

13

the evidence could be plainly viewed.' Second, the incriminating character of the evidence must be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (quoting *Horton v. California*, 496 U.S. 128, 141 (1990)). We recently held that "the plain view doctrine applies to seizures of evidence during searches of computer files," noting that "the exact confines of the doctrine will vary from case to case in a common-sense, fact-intensive manner." *Stabile*, 633 F.3d at 240–41. In *Stabile*, we held that evidence of child pornography discovered during an officer's examination of file names in a suspiciously titled folder did not require suppression because: (1) the officer was authorized by a warrant to search the hard drive at issue and to access the suspicious folder to search for financial crimes; and (2) the lurid file names immediately suggested that they contained contraband. *Id.* at 241–42.

In this case, the warrant authorized Lucas to access Karrer's cellular phone to search for evidence of unlawful communications with minors, and he did not violate the Fourth Amendment in arriving in the phone's photos folder. *See Menon*, 24 F.3d at 560 (explaining that a search is within the scope of the warrant "if [it] fits within the literal terms of the warrant and is a reasonable means of obtaining the objects described in the warrant"). We reach this conclusion because we find no clear error in the District Court's

---

*Christine*, 687 F.2d at 754,—in this case, anything seized based on those provisions

implicit factual finding that cell phones often archive communications as image files, which may be saved in photos folders.[5]  Once Lucas had entered the photos folder, it was readily apparent that one image likely depicted a sexual offense against a child, and thus constituted child pornography, based on the sizes and characteristics of the hand and genitalia in the photo.  The image located on Karrer's cell phone was therefore admissible under the "plain view" exception, and the subsequently discovered evidence of child pornography did not require suppression.[6]

---

regarding evidence of unlawful contact with a minor.

[5] Based on Lucas's testimony at the suppression hearing, the District Court concluded that "[t]he alleged internet communications described in the warrant and affidavit could have been conducted through Karrer's cellular telephone, and evidence could logically be stored there."  Lucas testified that it is "[v]ery common[,] [s]pecifically with cell phones," for "documents and files related to conversations to have an image component or picture component," and that remnants of those and other Internet-based communications are "often preserved as image files."  Moreover, according to the officers, not only images of text or Internet conversations, but also photographs themselves could provide evidence of unlawful communications.  Lucas testified that an "image [can be] saved out of [a] message into the images and then the message [can be] deleted."

[6] Because the "plain view" doctrine allowed for the introduction of all of the child pornography evidence discovered after and as a result of Lucas's identification of an image depicting child molestation on Karrer's cell phone, we need not resolve whether the child pornography evidence was otherwise admissible under the "good faith" or "inevitable discovery" exceptions to the exclusionary rule.  *See, e.g.*, *Ninety-Two Thousand*, 307 F.3d at 145–46 (describing the "good faith" exception established in *United States v. Leon*, 468 U.S. 897 (1984)); *United States v. Vasquez De Reyes*, 149 F.3d

## III

For the foregoing reasons, we will affirm Karrer's judgment of conviction.

---

192, 195 (3d Cir. 1998) (outlining the "inevitable discovery" exception set forth in *Nix v. Williams*, 467 U.S. 431 (1984)).